THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DOMINIC NWADIEI, Defendant-Appellant.

First District (1st Division)   No. 1—87—3576

Opinion filed December 24, 1990.

Gordon H. Berry, of State Appellate Defender's Office, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Terence M. Madsen, William P. Pistorius, and David S. Meyerson, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE O'CONNOR delivered the opinion of the court:

Dominic Nwadiei was charged with multiple counts of public aid vendor fraud (Ill. Rev. Stat. 1983, ch. 23, par. 8A—3), conspiracy (Ill. Rev. Stat. 1983, ch. 38, par. 8—2), and theft (Ill. Rev. Stat. 1983, ch. 38, par. 16—1), for submitting fraudulent medicaid claims to the State medicaid program. A jury found Nwadiei guilty on all counts, he was convicted and sentenced to concurrent terms of nine years for vendor fraud and five years for theft and conspiracy. For the reasons below, we reverse and remand.

Dominic Nwadiei, a pharmacist, was charged with vendor fraud, theft, and conspiracy for submitting false medicaid claims through nine pharmacies in Bellwood, Maywood, and Chicago. Ultimately, Nwadiei was prosecuted for vendor fraud and theft for claims submitted through four pharmacies, Northwest, 5th Avenue, Maywood, and Princeton. The charges of vendor fraud and theft arising from claims submitted through the remaining five pharmacies, Cermak, Chif, A&E, Sharon's, and St. Lawrence, were nol-prossed, although the record contains no formal certification of *nolle prosequi*. The conspiracy charge involved claims from all nine pharmacies.

At trial, the State introduced witnesses from the Illinois Department of Public Aid (IDPA), who established the procedures for verification of claims submitted to the medicaid program. First, doctors enrolled in the medicaid program as prescribers of medicine are

assigned a unique "DEA" number by the Drug Enforcement Agency. IDPA assigns a unique "recipient" number to medicaid patients, and a unique "provider" number to pharmacies that fill medicaid prescriptions. To bill IDPA, the pharmacy must submit a claim with information concerning the medicine provided, dosage, and price. The claim must also include the pharmacy's provider number, the patient's recipient number, and the doctor's DEA number. When IDPA receives a claim, it is assigned a unique document control number, and all the information is entered into IDPA's computerized Medicaid Management Information System (MMIS). IDPA then verifies the claims by comparing DEA, provider, and recipient numbers. Verified claims are paid, and rejected claims are held for investigation. IDPA sends the provider a report showing which claims were accepted and which were rejected.

The State also introduced computer printouts from MMIS that showed medicaid claims from Nwadiei's pharmacies, sorted according to DEA number, recipient number, and provider number. The printouts showed duplicated claims, and nine doctors, including Dr. Gumidyala and Dr. LaRoche, testified that most of the claims with their DEA numbers involved recipients who were not their patients. Four public aid recipients testified that most of the claims with their recipient number were for prescriptions their doctors had not given them. An ex-employee of a computer billing service testified that Nwadiei had personally brought claims from all the pharmacies in question to the service for processing.

The State also called Anthony Ruffolo, an accountant employed by the State Police. Ruffolo prepared four large exhibits, exhibits 244, 245, 246, and 247, which presented total number and dollar amounts for the medicaid claims from each of the four prosecuted pharmacies. The labels on the exhibits stated, "AMOUNT OF MEDICAID DOLLARS PAID FOR FRAUDULENT CLAIMS TO [PHARMACY NAME] PER PHYSICIAN," and the exhibits contained several columns showing subtotals of numbers of prescription and dollar amounts that were labelled as "false." Defense counsel objected to introduction of the exhibits, arguing that the labelling was prejudicial and addressed an ultimate issue in the case. The trial court overruled the objection, stating that the falseness and fraudulence of the claims was a reasonable inference. During Mr. Ruffolo's testimony explaining the exhibits, he made several statements that the claims represented in the exhibits were "false" and "fraudulent."

Two pharmacists, Mr. Ibeanu, and Mr. Azuh, who had been friends and business associates of Nwadiei as part owners of Nwa-

diei's pharmacies, testified to the dates Nwadiei's nine pharmacies had opened and closed. Mr. Ibeanu testified, under a grant of immunity, that Nwadiei had pressured him to sign fraudulent invoices from three pharmacies he owned with Nwadiei, the 5th Avenue, Maywood, and Northwest pharmacies. Mr. Azuh admitted to previous convictions of unemployment compensation fraud and delivery of a controlled substance, and also that deportation proceedings were pending against him. Azuh testified that he had engaged in fraudulent medicaid billing with Nwadiei at the Princeton pharmacy.

Nwadiei testified on his own behalf, stating that he had been associated with Ibeanu and Azuh since 1982. Nwadiei had loaned Ibeanu a total of $22,000 for schooling, and had set up Ibeanu in business, listing himself as an owner of the pharmacies to guarantee repayment of the loans. Nwadiei denied falsifying any medicaid billings.

On cross-examination, the prosecution questioned Nwadiei at length whether Mr. Azuh, Dr. Gumidyala, Dr. LaRoche, Mr. Ruffolo, and Mr. Ibeanu had lied when they testified:

"PROSECUTOR: Sir, when [Azuh] said that he and Mr. Aski [sic] bought the pharmacy from you, he lied. That's what you said.

NWADIEI: Um-hmm, he said—.

PROSECUTOR: Is that what you are saying, he lied, right?

NWADIEI: Listen—.

PROSECUTOR: Sir, I'm asking you a question *** are you saying he lied about you?

NWADIEI: Yeah, he lied.
***
PROSECUTOR: Sir, do you remember Dr. Gumidyala saying 'They came to see me together'? Do you remember that?

NWADIEI: Um-hum.

PROSECUTOR: Was Dr. Gumidyala lying then?

NWADIEI: He is lying, you know.

PROSECUTOR: He is lying about you?

NWADIEI: I went with Emmanuel to see him.

PROSECUTOR: Sir, is he lying ***[?]

NWADIEI: *** Repeat the question ***.

PROSECUTOR: Sir, was Dr. Gumidyala lying about you when he said you and Emmanuel came together to rent the pharmacy?

NWADIEI: He was lying.
***
PROSECUTOR: What about Dr. LaRoche, was he lying—[?]

DEFENSE COUNSEL: I object to that because Dr. Gumidyala said two people. He never said Mr. Nwadiei was one of those people.

THE COURT: Sustained.

PROSECUTOR: Sir, was Dr. LaRoche lying when he said he knew from you [sic] Princeton Pharmacy?

NWADIEI: Yeah, Dr. LaRoche, I know him.

\*\*\*

PROSECUTOR: Remember [Mr. Ruffolo] sitting up here and he had the big chart and he said he had counted them and there was [sic] 7,659?

NWADIEI: The information you gave to him was what he was analyzing.

PROSECUTOR: Yeah, he was analyzing these records. Was he lying about you too?

NWADIEI: I don't know.

PROSECUTOR: I see. But you are not sure?

NWADIEI: If it's there, it's correct.

\*\*\*

PROSECUTOR: Lots of people lie about you, don't they?

NWADIEI: Did I say they lie about me?

PROSECUTOR: Yes, you did.

NWADIEI: I don't say that.

\*\*\*

PROSECUTOR: Is [Ibeanu] a very smart man?

NWADIEI: He is.

PROSECUTOR: He is a very smart man, but he is a liar isn't he? He lied about you, didn't he?

NWADIEI: Yes, he did.

PROSECUTOR: Why would he lie about you? Why would your childhood friend lie about you?

NWADIEI: Why he would lie is a question you have to ask him.

PROSECUTOR: You don't know, he just lies about you?

NWADIEI: Listen, it was concerning women. He was telling my wife. My wife never liked him. He never like [sic] Ife [Ibeanu].

PROSECUTOR: Which wife?

NWADIEI: Stephanie.

PROSECUTOR: Never liked Ife. But why does he lie about you? Why?

NWADIEI: About women.

PROSECUTOR: Why does he lie about you?

NWADIEI: About women he lied because he wanted, you know—.

PROSECUTOR: Sir, you are saying—.

NWADIEI: People have selfish motives when they tell stories about somebody. He apologized to me.

PROSECUTOR: He told lies about you about women?

NWADIEI: Yeah, he apologized ***.

PROSECUTOR: Aren't you telling them that when he took the witness stand he lied about you?

NWADIEI: When he took—he lied to some of them, which were evident.

PROSECUTOR: He lied to some of them?

NWADIEI: Yeah.

PROSECUTOR: Why would he lie about you?

NWADIEI: To save his neck ***.

PROSECUTOR: Sir, are you saying—why would he lie about you?

NWADIEI: Because, he wants to avert the problems of his past, you know, that's why you came here to lie.

PROSECUTOR: What problems?

NWADIEI: You know, the convictions he had. Sending him back to immigration to Nigeria. You are the one who filed immigration deportation against him.

PROSECUTOR: No, sir, no, we didn't.

NWADIEI: That's what he told me.

PROSECUTOR: Sir, what you are saying is that a man would take that witness stand and he would lie in order not to be deported and not to have to go to jail, right?

NWADIEI: Yes.

PROSECUTOR: That's what you are saying? I think I understand.

***

PROSECUTOR: You are saying when [Ibeanu] took the stand and said this pharmacy (5th Avenue) closed in August of 1984 he lied about you too?

NWADIEI: You want to—.

PROSECUTOR: Sir, the question is was Mr. Ibeanu lying about you?

NWADIEI: He was lying, he was lying ***."

The prosecution also questioned Nwadiei at length concerning his operation of Savanna Drugs, a pharmacy that was named in none of the

indictments against Nwadiei, and not connected to any of the medi-caid claims for which Nwadiei was prosecuted.

> "PROSECUTOR: *** [W]ould you tell the *** jury what happened to Savanna Drugs?
>
> NWADIEI: Which one, the liquor part of the—[?]
>
> PROSECUTOR: The pharmacy?
>
> NWADIEI: Nothing happened to it.
>
> PROSECUTOR: The pharmacy didn't burn down?
>
> NWADIEI: No the liquor store burned down ***. They are two different buildings ***.
>
> PROSECUTOR: So your pharmacy never burned?
>
> NWADIEI: No ***.
>
> PROSECUTOR: Did you close it with the Department of Registration and Education?
>
> NWADIEI: Yes.
>
> PROSECUTOR: And did you have an inspector come out there?
>
> NWADIEI: The inspector didn't have to come out there ***. They can take the information on the phone ***.
>
> PROSECUTOR: And the pharmacy didn't burn down?
>
> NWADIEI: No."

Later in the cross-examination, the prosecution returned to Savanna Drugs:

> "PROSECUTOR: Now, sir, this Savanna drugs, it burned, didn't it?
>
> NWADIEI: The liquor store burned.
>
> PROSECUTOR: The pharmacy didn't burn?
>
> NWADIEI: No.
>
> PROSECUTOR: So if [a Department of Registration investigator who did not testify] indicated that the [Savanna] pharmacy burned after the department had requested all the records for audit *** he would be lying about you too?
>
> NWADIEI: There's nobody who ever requested any records or anything."

Objections to further questions, and exhibits, concerning Savanna Drugs were sustained.

During closing arguments, the prosecution argued that Nwadiei was guilty because he had associated, personally and professionally, with confessed criminals:

> "When you see a man and you see the people that he is with, doesn't that tell you something about the type of person he is? When you see who he works with, who his business partners

are, who he associates with.

*** Now, he's in with Mr. Ibeanu who admitted to you that he's a thief. Who do thieves associate with. Mr. Dominic's ancestors may have been greatest people in the world. Not everyone in the family is the same. And in this family there's a rotten apple and it's sitting right there.

*** Mr. Azuh testified. I'm not going to tell you Mr. Azuh is a wonderful man. Mr. Azuh had been convicted of unemployment compensation fraud. He's been convicted of trading a controlled substance for birth control pills and he was arrested on this case ***. I'm not going to tell you he is a wonderful man. I'll tell you one thing, unless I were a thief, I wouldn't be in business with him ***.

*** And if you think about it and listen to the evidence and use your common sense, the man is a thief who has worked with thieves and has stolen your money."

The jury found Nwadiei guilty on all counts, and he was convicted and sentenced to concurrent terms of nine years for vendor fraud and five years for theft and conspiracy. Nwadiei appeals.

Nwadiei argues that prejudicial evidence and improper conduct by the prosecution were substantially prejudicial. We agree. Reviewing pursuant to the doctrine of plain error, we find that the improper cross-examination of Nwadiei and the improper and prejudicial characterization of substantive evidence deprived Nwadiei of a fair trial.

■■ ■ We first address the most egregious error, the prosecution's cross-examination questions asking Nwadiei whether he thought several State's witnesses had lied. Although asking the defendant's opinion of the veracity of other witnesses has been condemned (*People v. Bost* (1980), 80 Ill. App. 3d 933, 947, 400 N.E.2d 734, 745, citing *People v. Butler* (1974), 58 Ill. 2d 45, 52, 317 N.E.2d 35), the practice generally has not, by itself, been held reversible (*e.g., People v. Riley* (1978), 63 Ill. App. 3d 176, 379 N.E.2d 746). Here, however, the questioning was far more extensive than in any prior case. For example, in *People v. Graves* (1978), 61 Ill. App. 3d 732, 378 N.E.2d 293, three questions were asked, and in *People v. Hicks* (1971), 133 Ill. App. 2d 424, 273 N.E.2d 450, four questions were asked. In *People v. Meeks* (1973), 11 Ill. App. 3d 973, 297 N.E.2d 705, *cert. denied* (1974), 418 U.S. 905, 411 L. Ed. 2d 1153, 94 S. Ct. 3196, the questioning, though lengthy, addressed the testimony concerning a minor detail and was far less extensive than here.

Here, the prosecution devoted most of its cross-examination to asking Nwadiei whether six State's witnesses, Mr. Azuh, Mr. Ibeanu,

Mr. Ruffolo, Dr. Gumidyala, and Dr. LaRoche, had lied. Those six witnesses testified to substantial elements of the charges against Nwadiei. The prosecution asked Nwadiei three times whether Mr. Azuh had lied. The prosecution asked Nwadiei four times whether Dr. Gumidyala had lied. The prosecution asked Nwadiei twice whether Dr. LaRoche had lied. The prosecution asked Nwadiei whether Mr. Ruffolo had lied. The prosecution asked Nwadiei 12 times whether Mr. Ibeanu had lied.

The State maintains that because Nwadiei denied falsifying the medicaid claims, it was not error to question him concerning contradictory testimony by State's witnesses, relying on *People v. Piscotti* (1985), 136 Ill. App. 3d 420, 483 N.E.2d 363. But in *Piscotti*, the prosecution's questions were within the scope of the defendant's own direct examination testimony that certain State's witnesses had lied and he was the victim of a police conspiracy. Further, the court discerned that the prosecutor's questions were directed at the defendant's denials about statements he had made in police custody, and not at the defendant's opinion about whether other witnesses had lied. The prosecution's questions were "inartful" (*Piscotti*, 136 Ill. App. 3d at 424), but not improper. Here, the cross-examination was beyond the scope of the direct examination. Nwadiei had denied falsifying the medicaid claims, but asserted neither that any witness for the State had lied, nor that he was the victim of any kind of plot. Nwadiei stated that State's witnesses had lied only in response to the prosecution's improper questions.

The improper questioning facilitated further impropriety, the cross-examination about Savanna Drugs. Savanna Drugs was mentioned in none of the charges or indictments against Nwadiei. Nwadiei stated during direct examination that Savanna Drugs had burned, but he was never charged, or even accused, of any crime in connection with Savanna Drugs. On cross-examination, the prosecution elicited from Nwadiei that Savanna Drugs' liquor section, and not the pharmacy, had burned. The prosecution then asked Nwadiei whether an Illinois Department of Registration and Education investigator would be lying if he were to testify that the Savanna Drugs pharmacy burned after its records had been requested for investigation and audit. No such witness was called to testify.

■■ ■ The proscription against using evidence of other crimes to show the defendant's propensity for crime (*People v. Bean* (1990), 137 Ill. 2d 65, 107, 560 N.E.2d 258; *People v. Baptist* (1979), 76 Ill. 2d 19, 389 N.E.2d 1200) cannot be sidestepped merely by suggesting the existence of the evidence. Here, the prosecution

made no attempt to use the Savanna Drugs evidence for any legitimate purpose, such as linking it to the crimes charged or to show motive or *modus operandi*. Rather, the prosecution suggested wrongdoing at Savanna Drugs and substantiated that suggestion with the patently improper tactic of asking Nwadiei his opinion about the veracity of a hypothetical witness.

The State makes no attempt to justify its cross-examination about Savanna Drugs, but rather argues that Nwadiei failed to show how he was prejudiced by its introduction. The prejudice, however, was manifest: Savanna Drugs served no purpose but to forge the implication, which the jury could not have missed, that Nwadiei torched Savanna Drugs to prevent the State from obtaining records proving that he had committed there the same crime for which he was being tried.

In summary, the prosecution devoted most of its cross-examination of Nwadiei to a total of 23 questions asking his opinion as to the veracity of six material State's witnesses, and one hypothetical witness. Given the extent of the questioning, and its form, which directly elicited Nwadiei's opinion, the questioning cannot plausibly be construed as merely "inartful." The improper questioning, combined with the use of inadmissible evidence, evinced the intent to undermine Nwadiei's credibility and prejudice the jury against him.

■■ The improper cross-examination also exacerbated errors committed by the State in its case in chief. In its case against Nwadiei, the State introduced People's exhibits Nos. 244, 245, 246, and 247, which showed the total number and dollar amounts of medicaid claims submitted from each of four pharmacies owned by Nwadiei, and characterized those claims as "false" and "fraudulent." The trial court allowed the exhibits over defense counsel's objection, stating that the falsity of the claims was a reasonable inference. The trial court erred.

The exhibits were substantive evidence, based on IDPA records, and supported by IDPA procedures and the testimony of witnesses concerning information on the MMIS printouts. The evidence strongly supported the inference that the claims were false. But because the charges of vendor fraud and theft ultimately depended on whether the claims were false, their falsity was, as defense counsel argued, an ultimate issue in the case, solely for the jury to determine. The State's exhibits, however, asserted falsity as evidentiary fact, and having received such "fact," the jury could not have rejected, had it so chosen, the inference that the claims were false. Thus, the exhibits invaded the province of the jury. The characteri-

zation of the claims as "false" and "fraudulent," however strongly supported, was improper and prejudicial.

■ Finally, the prosecution improperly argued, during closing, that because Nwadiei had associated with Ibeanu and Azuh, confessed criminals, he also was a criminal. The State contends the prosecutor's remarks were necessary to establish the association and cooperation necessary to engage in a conspiracy, but the record shows that the prosecution did not assert that Nwadiei's participation in a conspiracy was proved by his association with Ibeanu and Azuh. Rather, the prosecution asserted that Nwadiei's association with Ibeanu and Azuh proved he was a bad man:

> "When you see a man and you see the people that he is with, doesn't that tell you something about *the type of person he is*? [Emphasis added.]
>
> \*\*\* [Nwadiei] is in with Mr. Ibeanu who admitted to you he's a thief. *Who do thieves associate with*. [Nwadiei's] ancestors may have been the greatest people in the world. Not everyone in the family is the same. *And in this family there's a rotten apple and it's sitting right there* \*\*\*. [Emphasis added.]
>
> \*\*\* I'm not going to tell you [Nwadiei] is a wonderful man. I'll tell you one thing, unless I were a thief I wouldn't be in business with him."

The prosecution was entitled to argue that Nwadiei had acted in concert with Ibeanu and Azuh to conspire to defraud the medicaid program, but the prosecution used the evidence of Nwadiei's association with Ibeanu and Azuh to persuade the jury that Nwadiei was a man of bad character. The prosecution's remarks, although clearly improper, would not constitute reversible error alone, but the remarks reinforced the prejudicial and inflammatory characterization of Nwadiei presented by the previous, substantial errors.

We reject the State's contention that any error was harmless due to overwhelming evidence of guilt. The evidence was sufficient to support a finding of guilt, but the prosecution, whether motivated by cynicism or misdirected zeal, engaged in calculated and extensive misconduct which, if not altogether preventing the jury from making an impartial, unbiased determination of guilt, certainly cast grave doubt on its ability to do so. The prosecution's misconduct clearly compromised Nwadiei's right to a fair trial, and where errors affecting substantial rights cannot be found harmless beyond reasonable doubt, they are grounds for reversal, without regard for the weight of the evidence. *Chapman v. California* (1967), 386 U.S.

880

18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *People v. Fierer* (1988), 124 Ill. 2d 176, 187, 529 N.E.2d 972.

■■ We note, for purposes of remand, that the prosecution properly introduced evidence of allegedly fraudulent medicaid claims from the five pharmacies from which charges of vendor fraud were nol-prossed. Nwadiei contends the State failed to prove that the claims from the nol-prossed pharmacies were fraudulent and therefore their relevance to crimes for which he was prosecuted was outweighed by their prejudicial effect. The five nol-prossed pharmacies were named in the conspiracy indictments, however, and the claims from those pharmacies were relevant evidence for the prosecution for conspiracy. There was no error in allowing evidence of medicaid claims made from the nol-prossed pharmacies. Nwadiei also contends that he was prejudiced by cross-examination questions implying that he was a womanizer, but the record shows that the questions in the single colloquy of which Nwadiei complains were intended to clarify the relationships among Nwadiei and his two wives and three children. The record supports no finding of prejudice. Finally, because we remand for a new trial, we need not address Nwadiei's arguments concerning sentencing.

In conclusion, although the evidence was sufficient to prove guilt, the prosecution's improper characterization of substantive evidence, improper cross-examination of Nwadiei and use of immaterial evidence denied Nwadiei a fair trial. Further, the prosecution's conduct appears to have been intentional, defeating any inference that the errors were harmless beyond reasonable doubt. Accordingly, we reverse and remand for a new trial.

Reversed and remanded.

BUCKLEY, P.J., and MANNING, J., concur.