SIXTH DIVISION
September 5, 2008

No.1-06-0594

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | No. 02 CF 1617 |
| | ) | |
| TURNER REEVES, | ) | Honorable |
| | ) | Joseph J. Urso, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE CAHILL delivered the opinion of the court:

After a jury trial, defendant Turner Reeves was convicted of the aggravated kidnaping, aggravated sexual assault and first-degree murder of Nassim Davoodi and the concealment of her homicidal death. The trial court sentenced defendant to natural life in prison without parole for murder. The court also imposed 30-year prison terms for aggravated kidnaping and aggravated criminal sexual assault, concurrent with each other and consecutive to the natural life sentence. Finally, the court imposed five years for the concealment of a homicidal death, consecutive to the other sentences.

Defendant raises six issues on appeal: (1) the State did not prove him guilty beyond a reasonable doubt of aggravated kidnaping; (2) the State committed a discovery violation that warrants a new trial; (3) the trial court denied defendant his right to exercise his peremptory

challenges to prospective jurors "in a meaningful way"; (4) the trial court erred in admitting testimony that he had a three-way sexual encounter with his friend Kristen Hill and codefendant Skylar Chambers four days before the murder; (5) the State did not prove beyond a reasonable doubt that defendant was death eligible, required for a sentence of natural life; and (6) the trial court erred in imposing sentences to be served consecutive to his natural life sentence. We affirm the convictions but vacate the consecutive sentences and order the mittimus corrected to show that all sentences are to run concurrently.

The record shows that on Friday, May 31, 2002, the victim's parents reported the 14-year-old Bartlett High School freshman missing when she did not come home from school after an early dismissal. The police investigation involved officers from the Carol Stream, Elmhurst and Bartlett police departments. It led officers to question defendant, who gave differing accounts of his involvement in the victim's disappearance. These accounts implicated Skylar Chambers, who was staying at defendant's home in Hanover Park. Defendant also implicated two others: Jarrett Curtis, his cousin and a Bartlett High School student who lived with defendant's family, and Izabela Nagler, defendant's former girlfriend.

Chambers was arrested on June 3, 2002. On the same day, Carol Stream police officers brought defendant to the police station for questioning. Defendant waived his Miranda rights and gave several differing statements, including one on videotape. He was arrested for first-degree murder on June 6, 2002. On defendant's motions, the case was transferred from Du Page to Cook County and severed from the case against Chambers.

Defendant was represented by three different sets of attorneys: (1) Du Page County assistant public defenders, who withdrew when the case was transferred to Cook County; (2)

private attorney Thomas Brandstrader, who withdrew because of differences with defendant; and (3) private attorneys Leland Shalgos and Mike Clancy, who represented defendant at trial and sentencing. When the trial court granted the Du Page County assistant public defenders' motion to withdraw, the trial court asked, "You have tendered everything?" Assistant Public Defender William Padash answered in the affirmative. Brandstrader began representing defendant but the relationship soon deteriorated. On July 7, 2005, the trial court allowed Shalgos to file an appearance as counsel for defendant but declined to allow Brandstrader to withdraw until Shalgos was "brought up to snuff" on the case. One week later, Shalgos told the court he had familiarized himself with the case and reported the State had given him "an entirely new file." At a later case management conference, Shalgos said he had read "all the transcripts" and reviewed "all the files." Reiterating that the State had provided a new case file, Shalgos said, "I know that I have everything. And I have reviewed everything."

Shalgos and Clancy represented defendant at a pretrial hearing on a motion to suppress statements on August 16, 2002. The motion alleged that defendant's statements were involuntary because of sleep and food deprivation, intimidation and coercion. The State called Bartlett police detective Scott Yarwood, who testified that he saw defendant sleeping at about 9:30 a.m. on June 5, 2002, in a cell at the Bartlett police department. On cross-examination, Yarwood admitted he did not know how long defendant had been sleeping but he said a video camera would have recorded everything that happened in the cell. Yarwood said he did not know if the department had kept the tapes. Defendant admitted that he had slept for four to five hours but maintained it was not a deep sleep. The trial court denied the suppression motion, concluding that the evidence did not show defendant had been deprived of sleep "in any meaningful way."

3

Before jury selection, defendant proposed questions for prospective jurors, including the following: "[T]here will be evidence of a false confession being made. Will you be willing to evaluate the testimony of the police officers just as any other witness in this case and if you feel the police officer [has] fabricated evidence, disregard his testimony?" The trial court ruled that the question could not be asked as worded, but added: "You may again inquire of this. I believe I will cover this area as to the weight that should be given to an officer's testimony or not given to an officer's testimony. If that is not satisfactory, you may inquire."

During *voir dire*, the trial judge asked prospective jurors whether they would use the same standard to evaluate the testimony of a police officer as for other witnesses. After several prospective jurors were questioned, defense counsel said to one: "There's going to be evidence here of a false confession." The State objected and the trial court sustained the objection. In a sidebar, the trial judge told defense counsel that a properly phrased question would be allowed. The judge told defense counsel: "You may ask something to the [effect that] there may be evidence *** of a false statement. You *** cannot presume that there is going to be evidence." Defense counsel then told the prospective juror: "[You] may hear evidence during the course of the trial of a false statement" made by defendant. Defense counsel then asked: "Would you be able to evaluate [defendant's] testimony at the same level as the police officer who is taking the opposition position?" The State objected and the trial judge sustained the objection "as to that question." Defense counsel then ended his examination of the prospective juror and did not raise the subject "false statement" or "false confession" again in *voir dire*.

4

The trial began on October 25, 2005. In opening statements, defense counsel said: "[Y]ou will hear testimony that [defendant] was in a police station for almost 48 hours with no sleep." "Basically, he was up for 48 hours."

The State called 17 witnesses. Jackie Bahena, a friend of the victim, testified that she saw Curtis introduce Chambers to the victim after school on the day before the murder. Bahena said Chambers and the victim talked for a few minutes and when they said good-bye, Chambers gave the victim a hug. The next day the victim at first hid from Chambers after school, but the victim apparently changed her mind and approached Chambers. The victim then walked away with Chambers and Curtis. Bahena said when she last saw the victim, she was holding open defendant's car door as if she were about to get in. On cross-examination, Bahena said the victim did not want to approach Chambers at first on the day of the murder, but she did so freely when he appeared about 20 feet away from where she was hiding.

Jarrett Curtis testified for the State as a subpoenaed witness. Curtis said he usually took the bus to and from school but defendant would pick him up "every blue moon." He said defendant and Chambers unexpectedly picked him up from school in defendant's car on the day before the murder. Chambers asked to be introduced to the victim and Curtis did so. Chambers offered the victim a ride home, but she refused, saying Chambers could talk to her the next day.

Curtis said when school was dismissed at 12:40 p.m. the next day, defendant and Chambers were again at the school. Chambers again offered the victim a ride home. After the victim accepted the ride, Chambers said they would be going to a mall instead of taking the victim home and the victim agreed. Curtis sat in a front seat, defendant drove and Chambers and the victim sat in the backseat. Defendant drove to the house of Izabela Nagler, defendant's

girlfriend.  After talking to Nagler, defendant drove to his own house.  Defendant opened the garage door and drove into the garage.  Curtis got out and went into the house.  Defendant remained in the car but later entered and left the house two times.  Curtis said he went outside at about 2:30 p.m. but he did not hear the car in the garage or see defendant, Chambers or the victim.

Curtis said he next saw defendant at 6:30 p.m. that day when defendant told him that if the police asked about the victim, Curtis should say he last saw her get into a white Buick with some Mexicans.  Defendant seemed "a little nervous" and acted as if he could not explain himself in the presence of Chambers.  Curtis said Chambers told him the victim ran away.

Curtis stated on cross-examination that the victim agreed at school to get into defendant's car and that no one forced her.  Curtis spoke with defendant about the missing girl two nights later when defendant said to him, "I've got to tell you something."  Before defendant could do so, Chambers entered the room and "[defendant] just changed his whole demeanor."  Curtis admitted on redirect he had given multiple videotaped statements to the police and that he had lied in his first videotaped statement "[b]ecause I was trying to save [defendant]."

Carol Stream police detective Kelly Lally testified that he questioned defendant at defendant's parents' home in Hanover Park on the evening of June 2, 2002.  Lally said defendant told him that he first saw the victim on May 31, 2002, shortly after he arrived at Bartlett High School to pick up his cousin Curtis.  Defendant told Lally he saw the victim get into a white Buick with two male Hispanics and leave the school.

Lally said the next evening, June 3, 2002, the Carol Stream police arrested defendant outside his home.  At about 11 p.m., defendant waived his rights and spoke with Lally and

6

another officer. Defendant at first repeated the story about the victim getting into a Buick but changed his story after being told the police had spoken with Curtis. Defendant admitted he had been at Bartlett High School on both May 30 and 31, 2002, and that the victim had been in his car with him, Curtis and Chambers on May 31, 2002. Defendant said he, the victim and Chambers had driven around until they stopped at the Busse Woods Forest Preserve in Schaumburg. Defendant said the victim and Chambers walked to the woods and defendant lost sight of them for 45 minutes. Defendant said Chambers emerged from the woods alone, saying the victim met some friends in the woods and left with them. Lally said defendant then agreed to give a written statement. Lally introduced defendant to Du Page County Assistant State's Attorney Jeff Kendall and defendant agreed to give a videotaped statement. The tape was admitted into evidence and a written transcript of the tape was admitted over defense counsel's objection. The tape was played and the transcript was published to the jury.

Lally said in the early morning hours of June 4, 2002, defendant agreed to retrace the route he drove on the day of the murder. The police searched Busse Woods for about 2 1/2 hours while defendant waited in a patrol car, drinking soda and napping. On cross-examination, Lally said he went off duty after the search but when he saw defendant the next day, defendant said he had eaten and slept.

Elmhurst police officer Michael Campise testified that defendant gave him differing accounts of the events of May 31, 2002. Campise said defendant told him he realized the victim was dead but did not know how she died. Defendant later gave Campise detailed instructions on where to find the victim's body. On cross-examination, Campise said defendant told him he did not want to ask Chambers questions about the victim because he feared Chambers "might go

7

crazy or something." Campise inferred from defendant's statements that Chambers had martial arts training. Defendant told him Chambers became "bug-eyed" and looked "in a crazy way" at the burial site.

Dr. Nancy Jones, a forensic pathologist who works as a Cook County medical examiner, testified as an expert witness. She said the victim was sexually assaulted, suffered blunt trauma to the head and suffocation and died from strangulation.

Du Page County Assistant State's Attorney Jeff Kendall testified that he participated in a videotaped conversation with defendant and Detective Lally at 2 a.m. on June 4, 2002. Kendall said that when he asked defendant why he did not try to stop the victim from being assaulted and killed, defendant said, "I don't know, I was afraid of Chambers."

Barlett detective Scott Yarwood testified that he interviewed defendant at the Bartlett police station. As at the pretrial hearing, Yarwood said that he saw defendant sleeping in a bed in a cell at the station. Yarwood said the cell was equipped with a video recorder and that he had seen a videotape of himself awakening defendant at 9:30 a.m. on June 5, 2002, in the cell.

Defense counsel objected, and a sidebar was held. Defense counsel said he had watched every videotape tendered through discovery and never saw a tape of defendant sleeping in a cell. The assistant State's Attorney referred to the transcript of the hearing on defendant's motion to suppress statements to show that Yarwood had mentioned a videotape of the lockup area at that time. The assistant State's Attorney also pointed to page 238 of the State's inventory slip tendered in discovery where an entry showed that three tapes from the Bartlett lockup of defendant sleeping had been tendered to the defense. The assistant State's Attorney said defendant's attorneys had been to a room in the Carol Stream police department where "they

8

went through all the evidence that we had on this case" and looked at the evidence custodian's log. He said two videotape players were available to the defense attorneys.

Defense counsel argued in rebuttal that Yarwood had said he did not know whether the Carol Stream department had kept the videotapes. Defense counsel said the videotapes tendered in discovery were "all over the place," unmarked and included tapes from defendant's home. Counsel said the video player made available to them "was behind 40 chairs, and the video machine was never turned on, and we didn't look at any tapes. *** No one knew what these tapes were. And we've never seen and never had possession of that videotape." The assistant State's Attorney said a videotape of defendant sleeping existed and the State intended to introduce it at trial. Defense counsel moved to bar the tape from being entered into evidence and published to the jury. In the alternative, defense counsel asked to view the tape outside the presence of the jury. The court denied the motion to bar the tape but allowed defense counsel to view it outside the jury's presence before it was shown to the jury.

After viewing the videotape that showed defendant sleeping, defense counsel challenged the authenticity of the tape, arguing that the time stamp on the tape differed from the time given by Yarwood in his testimony. Defense counsel again argued that the State had not disclosed the tape in discovery, that defense counsel had viewed every tape tendered and that the large number of tapes in the Carol Stream evidence room made it impossible to preview all tapes. The assistant State's Attorney admitted that the date and time on the tape were incorrect and said he would address the discrepancy when he laid a foundation for the tape. He said he had not planned to introduce the tape until earlier testimony showed that sleep would be an issue. Defense counsel argued against admitting the tape, noting that defendant's current counsel was

9

not the same counsel as when the tape and inventory slip were "supposedly tendered" to defendant's attorneys. The trial court allowed the tape into evidence, finding that the State had laid a proper foundation.

On cross-examination, Yarwood admitted that it was not possible to determine whether defendant's eyes were open or closed in the video of him in the lockup. Yarwood admitted that defendant appeared to be "tossing and turning" when he was lying on the bed.

Forensic scientist Tamera Camp of the Du Page County sheriff's office crime laboratory testified as an expert witness. She said she analyzed oral, rectal and vaginal swabs taken from the victim. She also analyzed fluids found on the victim's pants and on the carpet inside defendant's car. Camp said she found defendant's DNA on the vaginal and rectal swabs, on the crotch of the victim's pants and on the carpet sample. On cross-examination, Camp said only defendant's DNA was found on the carpet sample. She said the rectal and vaginal swabs and the fluid on the crotch of the victim's pants showed defendant was the minor contributor while Chambers was the major contributor of semen.

The State rested. Defendant moved for a directed verdict. The trial court denied the motion.

Dr. Shaku Teas testified as an expert for defendant. He said Dr. Jones told him she might have picked up some semen on the swabs from outside the victim's vaginal opening. On cross-examination, Dr. Teas admitted he was not present when Dr. Jones took the vaginal swabs. He said he agreed with Dr. Jones' findings and opinions.

Defendant testified in his own behalf. He said he drove his car to Bartlett High School on May 31, 2002, to pick up Curtis. Chambers got out of the car and returned with the victim

whom defendant did not know. Chambers asked defendant to give the victim a ride home. Defendant said he intended to drive directly to the victim's house but instead drove to Nagler's home. After that, defendant asked the victim where she lived, but Chambers suggested they "just go by [defendant's] house real quick." Chambers insisted he needed to take a shower. Defendant drove to his house and pulled into the garage, leaving the garage door open. The victim asked him to close the garage door, saying she knew someone who lived across the street. He then went inside the house with Curtis. Defendant said his mother was at work and was not expected to arrive home until 2:45 or 3 p.m.

Defendant said Chambers and the victim remained in the car in the closed garage while he was inside the house. When defendant returned to the garage about five minutes later, he got into the car near where the victim was sitting with her pants pulled down. She gave him a "hand-job," causing him to ejaculate.

Chambers then told defendant to get a pillow from inside the house. Defendant got two pillows, put them inside the car and went back inside the house for 20 to 25 minutes. When defendant returned to the car, Chambers was on top of the victim and had her in a chokehold. Defendant yelled to Chambers, "What are you doing? What are you doing?" The victim lost and regained consciousness as Chambers held a pillow over her face. Defendant said Chambers told him to grab the victim's arm and he did so "[b]ecause I thought if I grabbed her arm, he would take the pillow off of her face." But Chambers did not take the pillow off the victim's face. The victim then put her arm on Chambers' shoulder and then her arm began to come down "real slowly." Defendant said he asked Chambers what he was doing and said, "This isn't right."

Defendant said that Chambers had a "bug-eyed type of look" and told him to grab some shovels. Defendant did not respond at first, so Chambers repeated loudly, "Grab some shovels." Defendant did so and Chambers put the shovels in the backseat of defendant's car. Defendant drove for a couple of miles to the location where the victim would be buried. Defendant helped Chambers pull the victim from the car, dig a hole and put the victim in the hole. They then returned to his car. Defendant said he drove to a car wash where he cleaned the car's interior and exterior.

Defendant denied knowing that Chambers planned to kill the victim. He also denied participating in the killing of the victim. He said when he was arrested at 8 p.m. on June 3, 2002, he had been up for about 12 hours. From the time he was arrested until his last videotaped interrogation at about 7 p.m. on June 5, 2002, he had slept only about four hours.

On cross-examination, defendant said his friend, Kristen Hill, visited him and Chambers at defendant's home three nights before the murder. Defense counsel requested a sidebar with the trial judge. Assistant State's Attorney Jane Radostits admitted that her questioning was intended to elicit defendant's testimony that he and Chambers had a consensual three-way sexual encounter with Hill. She said the purpose of the examination was to show defendant's relationship with Chambers and that defendant was not afraid of or coerced by Chambers. Defense counsel objected on the grounds that no criminal activity was involved and the probative value of the evidence was minimal. The trial court overruled defense counsel's objection, concluding that the evidence was more probative than prejudicial. Defendant testified that he was not afraid of Chambers when he, Hill and Chambers were in defendant's bedroom together. Defendant admitted the three of them had sex that evening.

12

The jury returned a verdict of guilty. Defendant moved for a new trial. Among the grounds was trial court error in refusing to exclude the videotape of him sleeping. The court denied the motion, concluding that the videotape had been made available to the defense by the prosecution. The court acknowledged that defendant had been represented by several sets of attorneys but concluded that each set had given what it had to the next set of attorneys. Defendant also argued that he was entitled to a new trial because the court erred in allowing the State to question defendant about his sexual encounter with Hill and Chambers. The court determined that the evidence was relevant and denied the motion.

At sentencing, the trial court found defendant death eligible based on the aggravating factors in sections 9-1(b)(6)(a)(ii), (b)(11) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(b)(6)(a)(ii), (b)(11) (West 2002)). The court found defendant personally had inflicted physical injuries substantially contemporaneously with the physical injuries caused by Chambers for whose conduct defendant was accountable under section 9-1(b)(6)(a)(ii) of the Code (720 ILCS 5/9-1(b)(6)(a)(ii) (West 2002)). The court found defendant was an active participant in inflicting the injuries that caused the victim's death and that he acted with the intent to kill or knowledge that his acts created a strong probability of death under section 9-1(b)(6)(b) of the Code (720 ILCS 5/9-1(b)(6)(b) (West 2002)). The court concluded that both defendant and Chambers had actively participated in the sexual assault and murder because both were in the small area of the backseat of defendant's car when the victim was killed. The court believed it would have been impossible to murder the victim unless both defendant and Chambers had held her hands or body. The court found that both defendant and Chambers planned to sexually assault and murder the victim and that defendant acted with the intent to kill her.

13

The court also found under section 9-1(b)(11) of the Code (720 ILCS 5/9-1-(b)(11) (West 2002)) another aggravating factor in support of death eligibility—that the murder was cold, calculated and premeditated. The court noted that this finding was unnecessary because it already had determined that defendant was an active participant in inflicting the victim's injuries under section 9-1(b)(6)(a)(ii) of the Code (720 ILCS 5/9-1(b)(6)(a)(ii) (West 2002)), but it made the ruling to further support its finding of death eligibility.

Defendant first argues that the State failed to prove him guilty beyond a reasonable doubt of aggravated kidnaping either as a principal or under a theory of accountability. He claims there was no evidence that he was the principal offender and insufficient evidence that he was Chambers' accomplice in the kidnaping.

The standard of review for a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational judge or jury could have found the essential elements of the offense beyond a reasonable doubt. People v. Collins, 214 Ill. 2d 206, 217, 824 N.E.2d 262 (2005). The reviewing court will not retry the defendant or impose its judgment of whether the evidence was sufficient. Collins, 214 Ill. 2d at 217. "We will not reverse a conviction unless the evidence is so improbable, unsatisfactory, or inconclusive that it creates a reasonable doubt of [the] defendant's guilt." Collins, 214 Ill. 2d at 217.

Under section 10-1(a)(3) of the Code, a person commits kidnaping when, by deceit or enticement and with the intent to secretly confine a person against her will, he induces her to go from one place to another. 720 ILCS 5/10-1(a)(3) (West 2002). The gist of the offense of kidnaping is secret confinement which must be proved beyond a reasonable doubt. People v.

14

Banks, 344 Ill. App. 3d 590, 593, 799 N.E.2d 503 (2003). "Secret confinement" is established

by showing that the victim was clearly " 'confined' or enclosed within something, such as a

house or a car." Banks, 344 Ill. App. 3d at 593. "[O]ne can be secretly confined in an

automobile within the meaning of the statute whether the automobile is moving or parked."

People v. Kittle, 140 Ill. App. 3d 951, 955, 489 N.E.2d 481 (1986).

Under section 10-2(a)(3) of the Code, the offense becomes aggravated kidnaping if the

perpetrator "[i]nflicts great bodily harm, other than by the discharge of a firearm, or commits

another felony [on] his victim." 720 ILCS 5/10-2(a)(3) (West 2002). Aggravated criminal

sexual assault is a trigger that elevates kidnaping to aggravated kidnaping. People v. Boyd, 366

Ill. App. 3d 84, 96, 851 N.E.2d 827 (2006).

A defendant will be convicted on an accountability theory when the evidence shows

"[e]ither before or during the commission of an offense, and with the intent to promote or

facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in

the planning or commission of the offense." 720 ILCS 5/5-2(c) (West 2005). Where, as here,

the evidence shows the defendant was at the scene of the kidnaping on the day before and again

on the day of the confinement, it supports the conclusion that the defendant was not merely

present but aided in the planning and commission of the act. People v. Rish, 208 Ill. App. 3d

751, 767-68, 566 N.E.2d 919 (1991). A defendant's involvement can be inferred from

inconsistent statements and after-the-fact behavior that amount to an attempt to conceal the truth.

Rish, 208 Ill. App. 3d at 768.

Active participation is not required for a guilty verdict under an accountability theory.

People v. Taylor, 164 Ill. 2d 131, 140, 646 N.E.2d 567 (1995). A jury may find a defendant

accountable for another's acts if the "defendant shared the criminal intent of the principal, or if there was a common criminal plan or purpose." Taylor, 164 Ill. 2d at 140-41. There need not be evidence of words of agreement to establish a common purpose. Taylor, 164 Ill. 2d at 141. The common design can be inferred from the circumstances. Taylor, 164 Ill. 2d at 141. Among the factors the jury may consider in determining whether a defendant is legally accountable for another person's acts are: (1) proof that the defendant was present when the crime was perpetrated; (2) proof that he maintained a close affiliation with his companion after the crime was committed; (3) whether the defendant reported the crime to the police; and (4) whether the defendant fled the scene. Taylor, 164 Ill. 2d at 141. "Evidence that [the] defendant voluntarily attached himself to [someone] bent on illegal acts with knowledge of its design also supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." Taylor, 164 Ill. 2d at 141.

Here, the evidence was sufficient to convict defendant of aggravated kidnaping as a principal. He deceived the victim by leading her to believe he would drive her home but he did not do so. As the driver of the car, defendant transported her with him from school to Nagler's house and then to his own house. There, she was confined to the inside of the car and enclosed in the garage where she was sexually assaulted and murdered. Defendant inflicted great bodily harm by restraining the victim while Chambers choked and smothered her. The DNA evidence showed defendant was not merely present but committed the felony of aggravated criminal sexual assault.

Even if the evidence had not been sufficient to prove defendant's guilt as a principal in the kidnaping, it was sufficient under an accountability theory. Defendant's testimony showed

16

he was present for all facets of the crimes from beginning to end. He maintained a close relationship with Chambers throughout. He did not report the crime and he fled from the burial site, stopping to clean evidence from his car. Defendant's voluntary association with Chambers supports the inference that they shared a common purpose.

Defendant relies on two opinions to argue that the State failed to prove him guilty of aggravated kidnaping beyond a reasonable doubt. In People v. Parker, 311 Ill. App. 3d 80, 86-87, 724 N.E.2d 203 (1999), the defendant argued he could not be held accountable for the codefendants' kidnaping of the victim where the evidence showed only that the defendant was present and knew of the illegal activity. This court agreed, finding no evidence that the defendant acted at the behest of the principal. Parker, 311 Ill. App. 3d at 88. The evidence here showed more. Defendant admitted that he drove his car to and from each location where crimes were committed. His car was the location of the sexual assault and murder and the means used to commit the kidnaping. Defendant admitted that he followed Chambers' directions to drive the victim to defendant's house, bring pillows to the car, hold the arm of the dying victim, get shovels, drive to the forest preserve and bury the body. Defendant was more than merely present and aware of criminal activity.

In People v. Sykes, 161 Ill. App. 3d 623, 628, 515 N.E.2d 253 (1987), the defendant argued that the State had failed to show he secretly confined the victim where he detained her in an alley but did not confine her within a place. This court agreed, finding that the State established neither the "secret" nor the "confinement" element of aggravated kidnaping. Sykes, 161 Ill. App. 3d at 628-29. Here, the victim was confined both inside a car and inside a garage with the door closed.

17

Defendant's second claim is that the trial court erred in admitting the videotape of him sleeping in his jail cell because the State did not tender the tape in discovery. He argues he was forced to reformulate his theory of defense when the State introduced the videotape on the third day of the trial. Defendant argues that although the State made the tape available, it was not "effective disclosure." The State maintains that the evidence shows the tape was properly disclosed to the defense.

Supreme Court Rule 412 governs the disclosure of the State's evidence to the defense. 188 Ill. 2d R. 412. One of the ways the State may fulfill its obligations is by "making available to defense counsel at the time specified such material and information, and suitable facilities or other arrangements for inspection." 188 Ill. 2d R. 412(e)(ii). When a defendant challenges a trial court's ruling on a purported discovery violation, we first determine whether a violation occurred. People v. Hood, 213 Ill. 2d 244, 256, 821 N.E.2d 258 (2004). Changes in defense counsel during the course of the case and the possibility that evidence could have been left behind or lost do not necessarily establish that the State failed to tender the discoverable material. People v. Salgado, 366 Ill. App. 3d 596, 605, 852 N.E.2d 266 (2006).

Here, no violation occurred. Shalgos repeatedly told the trial court he had received a new file from the State and had everything he needed to proceed as counsel after Brandstrader was granted leave to withdraw. Defense counsel admitted that evidence, including videotapes, was made available at the Carol Stream police department as required by Rule 412(e)(ii) (188 Ill. 2d R. 412(e)(ii)). It is undisputed that the file included an inventory slip that listed the lockup tapes from Bartlett. The transcript of the hearing on defendant's motion to suppress, where Shalgos was present, proves that Yarwood disclosed the existence and possible retention of the tape two

18

months before the defense opened the trial with a claim of sleep deprivation. The trial court did not err in allowing the tape into evidence because no discovery violation occurred.

Defendant next argues that the trial court erred in denying his request to ask potential jurors about their attitudes on "false confessions." He argues the court should not have sustained the State's objection to defense counsel's question: "You may hear evidence during the course of the trial of a false statement. *** Would you be able to evaluate [defendant's] testimony at the same level as the police officer who is taking the opposition position?" Defendant maintains that false confessions are controversial and the proposed question was necessary to determine whether prospective jurors could be fair to a defendant who claimed he gave a false confession. He argues that laypersons' perceptions of police behavior often is naive and so people may be unwilling or reluctant to accept the notion that suspects sometimes give false confessions.

The State maintains that the question would have improperly indoctrinated the jury on the defense.

When we review a trial court's denial of a party's request to question prospective jurors on a particular viewpoint, our standard of review is whether the court abused its discretion. People v. Howard, 147 Ill. 2d 103, 134, 588 N.E.2d 1044 (1991). *Voir dire* in a criminal trial is governed by Supreme Court Rule 431 (177 Ill. 2d R. 431) (parties are allowed to supplement the trial court's examination "by such direct inquiry as the court deems proper"). The purpose of *voir dire* is to select an impartial jury, not to indoctrinate a jury or choose a jury with a predisposition. People v. Bowel, 111 Ill. 2d 58, 64, 488 N.E.2d 995 (1986). A trial court properly refuses questions designed to educate the jurors on the defendant's theory of defense

19

and ensure the selected jurors are receptive to that defense. Bowel, 111 Ill. 2d at 65. In general, a proposed *voir dire* question addressing an affirmative defense should be excluded. People v. Kendricks, 121 Ill. App. 3d 442, 448, 459 N.E.2d 1137 (1984).

The question here is defective because it would have improperly indoctrinated the prospective jurors to defendant's affirmative defense. But the court's rationale for refusing the question was not indoctrination. The court refused the question because it would have required the prospective juror to accept as true that defendant had given a false statement. The jury was not going to hear evidence that the statement was false but that it was coerced. After hearing evidence that the statement was coerced, the jury might or might not have decided that the statement was false. The trial court properly refused the question, as phrased, because it would have required the prospective juror to accept as an ultimate fact that defendant's statement was false before hearing the evidence.

It is improper to assert falsity as an evidentiary fact. People v. Nwadiei, 207 Ill. App. 3d 869, 878, 566 N.E.2d 470 (1990). Once a jury has received falsity as an evidentiary fact, it cannot escape the inference of falsity. Nwadiei, 207 Ill. App. 3d at 878. This invades the province of the jury. Nwadiei, 207 Ill. App. 3d at 878. "The question [of] whether or not a confession is coerced involves a complex judgment [on] facts inevitably entangled with assumptions ***." Stroble v. State of California, 343 U.S. 181, 202-03, 96 L. Ed. 872, 887, 72 S. Ct. 599, 610 (1952) (Frankfurter, J., dissenting), citing Baumgartner v. United States, 322 U.S. 665, 670-71, 88 L. Ed. 1525, 1529, 64 S. Ct. 1240, 1243 (1943). The trial court here did not abuse its discretion in rejecting a question where the wording would have required the jury to assume that defendant's confession was coerced.

20

Defendant next argues that the trial court abused its discretion in allowing the State to elicit on cross-examination his admission to a three-way sexual encounter with Chambers and Hill. He argues the evidence was prejudicial in suggesting he had a propensity for deviate sexual acts and that the victim was murdered because she refused to consent to a threesome. The State argues that the evidence was properly admitted and relevant to rebut the defendant's claim that he was afraid of Chambers. The State argues that evidence of a sexual threesome among consenting adults was not prejudicial as a crime or necessarily prejudicial as a "bad act."

Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed on appeal absent a clear abuse of discretion. People v. Wheeler, 226 Ill. 2d 92, 132, 871 N.E.2d 728 (2007). A trial court abuses its discretion where no reasonable person would take its view. Wheeler, 226 Ill. 2d at 133.

In general, evidence of a defendant's other crimes is not admissible to show his propensity to commit the charged offense. People v. Donoho, 204 Ill. 2d 159, 170, 788 N.E.2d 707 (2003). This rule applies to noncriminal conduct or "bad acts," as well as crimes. People v. Bobo, 375 Ill. App. 3d 966, 971, 874 N.E.2d 297 (2007). "Courts generally prohibit the admission of this evidence to protect against the jury convicting a defendant because he or she is a bad person deserving punishment." Donoho, 204 Ill. 2d at 170. Such evidence generally is admissible to prove "any material fact *other than propensity* that is relevant to the case." (Emphasis added.) Donoho, 204 Ill. 2d at 170. The trial court must determine whether "the prejudicial effect of the evidence substantially outweighs its probative value." Donoho, 204 Ill. 2d at 170. A defendant cannot be heard to complain where evidence of his past misconduct was

not offered to show propensity but rather was invited by his own trial tactics. People v. Manley, 163 Ill. App. 3d 950, 953, 516 N.E.2d 1343 (1987).

Here, the purpose of the evidence of the threesome was to impeach defendant's testimony that he was afraid of Chambers, not to show his propensity to commit a sexual offense. Defendant's trial strategy hinged on showing that he aided in the crimes because he was afraid of Chambers. The evidence of the threesome was used to prove a fact other than propensity: that there was a close, trusting relationship between defendant and Chambers, rebutting defendant's claim that he feared Chambers.

Defendant relies on People v. Manning, 182 Ill. 2d 193, 214-15, 695 N.E.2d 423 (1998), to argue that the threesome evidence was not relevant to a material issue other than to imply bad character or the propensity to commit crime. In Manning, our supreme court determined that the trial court committed reversible error in admitting conversations between the defendant and a police informant where the two discussed helping each other evade conviction. Manning, 182 Ill. 2d at 213. The defendant allegedly offered to kill or arrange to have a key witness against the informant killed in exchange for the informant providing the defendant with an alibi. Manning, 182 Ill. 2d at 213. The State introduced evidence of their conversations during its direct examination of the informant. Manning, 182 Ill. 2d at 213. On appeal, the court concluded that the conversations were more prejudicial than probative and should not have been admitted. Manning, 182 Ill. 2d at 213. Noting that the State's evidence was "minimally sufficient," the court found that the challenged conversations improperly portrayed the defendant as a bad person who had a propensity to commit crime. Manning, 182 Ill. 2d at 215.

22

This case differs from <u>Manning</u> in that the threesome evidence here was used for impeachment, not as substantive evidence. <u>Manning</u> is also distinguishable because the bad acts there were crimes of murder and perjury, not a *legal* sex act. Finally, unlike the circumstances in <u>Manning</u>, the State's evidence here was overwhelming. Given the volume of incriminating evidence against defendant, the use of the threesome evidence as impeachment was more probative of the fact that defendant was not afraid of Chambers than prejudicial as deviant conduct. The trial court did not abuse its discretion in allowing the State to elicit this testimony on cross-examination.

Defendant next argues the trial court erred when it sentenced him to natural life in prison because the evidence did not establish beyond a reasonable doubt that he was death eligible. Our standard of review is whether a rational fact finder could have found that the State proved the necessary elements of death eligibility beyond a reasonable doubt. <u>People v. Emerson</u>, 189 Ill. 2d 436, 474, 727 N.E.2d 302 (2000). We view the evidence before the trial judge, sitting as the finder of fact at sentencing (<u>People v. Wiley</u>, 205 Ill. 2d 212, 223, 792 N.E.2d 1274 (2001)), and assess this evidence in the light most favorable to the prosecution (<u>Emerson</u>, 189 Ill. 2d at 474).

Section 9-1 of the Code sets forth the law and procedures on first degree murder and the death penalty. 720 ILCS 5/9-1 *et seq.* (West 2002). Section 9-1(b) enumerates the aggravating factors that warrant a death sentence. 720 ILCS 5/9-1(b) (West 2002). Section 9-1(b)(6) provides that a defendant convicted of first degree murder may be sentenced to death if:

"the murdered individual was killed in the course of another felony if:

(a) the murdered individual:

(i) was actually killed by the defendant, or

23

(ii) received physical injuries personally inflicted by the defendant substantially contemporaneously with physical injuries caused by one or more persons for whose conduct the defendant is legally accountable *** and the physical injuries inflected by either the defendant or the other person or persons for whose conduct he is legally accountable caused the death of the murdered individual; and

(b) in performing the acts which caused the death of the murdered individual or which resulted in physical injuries personally inflicted by the defendant on the murdered individual *** the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual ***; and

(c) the other felony was one of the following: *** aggravated criminal sexual assault, aggravated [kidnaping][.]"  720 ILCS 5/9-1(b)(6) (West 2002)).

Section 9-1(b)(11) of the Code provides that a defendant convicted of first degree murder may be sentenced to death if:

"the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable

24

expectation that the death of a human being would result." 720 ILCS 5/9-1(b)(11) (West 2002).

Section 9-1(f) of the Code provides that the State bears the burden of proving beyond a reasonable doubt the aggravating factors for death eligibility. 720 ILCS 5/9-1(f) (West 2002).

Defendant maintains that he is not death eligible under section 9-1(b)(6)(a) (720 ILCS 5/9-1(b)(6)(a) (West 2002)) because the State failed to prove beyond a reasonable doubt that he actually killed the victim or personally inflicted her injuries with the intent to kill her or that he had knowledge that his acts probably would cause death or great bodily harm. The State argues that defendant's actions in the kidnaping, sexual assault and murder of the victim, including physically restraining her while Chambers suffocated and strangled her, were sufficient to establish death eligibility under section 9-1(b)(6) of the Code. The State relies on People v. Palmer, 162 Ill. 2d 465, 485, 643 N.E.2d 797 (1994), where our supreme court determined that the appropriate factors for death eligibility existed where the evidence showed the defendant had held the victim while a codefendant slashed her throat. The court found that just because a codefendant "had [a] more culpable mental state does not support [the] conclusion that [the] defendant's participation and involvement in the commission of [the] offense was less than [the codefendant's]." Palmer, 162 Ill. 2d at 485. The question of who strikes the fatal blow "is not necessarily determinative of relative culpability." Palmer, 162 Ill. 2d at 486.

Here, the physical injuries inflicted by Chambers, a person for whose conduct defendant was legally accountable, caused the victim's death. Under Palmer, the fact that Chambers may have been more culpable does not diminish defendant's culpability. Defendant restrained the victim by holding her arm while Chambers strangled and suffocated her. This act supports the

conclusion that he acted either with the intent to kill or with the knowledge that his acts created a strong probability that the victim would die or suffer great bodily harm. Viewing the evidence in the light most favorable to the State, we believe that a reasonable judge could have found that the State proved death eligibility under section 9-1(b)(6) of the Code (720 ILCS 5/9-1(b)(6) (West 2002)) beyond a reasonable doubt.

Defendant also argues that he is not death eligible under section 9-1(b)(11) because there was no evidence that the crime was cold, calculated or premeditated or that defendant and Chambers had a preconceived plan. A murder is calculated, premeditated and committed according to a preconceived plan if the evidence shows it was "deliberated or reflected upon for an extended period of time." People v. Williams, 193 Ill. 2d 1, 37, 737 N.E.2d 230 (2000). See People v. Williams, 173 Ill. 2d 48, 91, 670 N.E.2d 638 (1996) (the defendant's contact with the victim over a two-day period supported the conclusion that the defendant murdered the victim after much thought and reflection and that the murder was cold, calculated and premeditated); People v. Kavinsky, 91 Ill. App. 3d 784, 799, 414 N.E.2d 1206 (1980) (the premeditated murder of a defenseless 11-year-old boy was cold and calculating). "[T]ime is an essential element of the aggravating factor" in section 9-1(b)(11). Williams, 193 Ill. 2d at 31; 720 ILCS 5/9-1(b)(11) (West 2002).

Here, the evidence showed that defendant aided Chambers in the murder of a defenseless 14-year-old girl. The timing component here was particularly incriminating, suggesting that defendant and Chambers had a detailed plan of action. They conducted reconnaissance at the high school on May 30, 2002, identifying a victim. Their return to the school the next day coincided with the time of the early dismissal at 12:40 p.m. That gave them enough time to

carry out a well-orchestrated plan. Defendant testified that he did not expect his mother to return home until 2:45 or 3 p.m. By 2:30 p.m., the victim had been sexually assaulted by both men, murdered and taken away from defendant's home. As Curtis testified, the car, the victim, defendant and codefendant were no longer in the garage at 2:30 p.m. By 6:30 p.m., the victim's body had been buried and the perpetrators had devised alternative explanations for her disappearance—she met friends in the woods or got into a Buick with Mexicans. This time sequence supports the existence and implementation of a carefully premeditated plan, the result of reflection and deliberation. This meets the criteria for death eligibility under section 9-1(b)(11) of the Code. 720 ILCS 5/9-1(b)(11) (West 2002).

Even if we had determined that defendant was not death eligible under one of the aggravating factors, our conclusion that he was eligible under one factor is sufficient: "[W]here a defendant is eligible based upon two or more statutory aggravating factors, the fact that one of those factors may later be invalidated may not impair the eligibility finding as long as a separate, valid aggravating factor supported eligibility." People v. Macri, 185 Ill. 2d 1, 58, 705 N.E.2d 772 (1998).

Defendant's final claim is that the trial court erred in ordering certain sentences to run consecutive to, instead of concurrently with, his natural life sentence. The State concedes that this is correct. Our supreme court in People v. Palmer, 218 Ill. 2d 148, 169, 843 N.E.2d 292 (2006), found that multiple life sentences must be served concurrently. This, the court said, "is governed by the laws of nature, regardless of whether a trial judge imposes his sentence consecutively or concurrently." Palmer, 218 Ill. 2d at 169. Nor can a term of years be served consecutively to a natural life sentence. People v. Dixon, 366 Ill. App. 3d 848, 853 N.E.2d 1235

(2006). Accord People v. Spears, 371 Ill. App. 3d 1000, 1008, 864 N.E.2d 758 (2007). Under Supreme Court Rule 615(b)(4) (134 Ill. 2d R. 615(b)(4)), we modify defendant's consecutive sentences to sentences concurrent with his natural life sentence.

In summary, we conclude that the evidence was sufficient to support defendant's conviction of aggravated kidnaping; the State did not commit a discovery violation as to the videotape of defendant sleeping in his jail cell; the trial court did not err in denying defendant's request to ask prospective jurors about the affirmative defense of a "false statement"; the trial court did not err in admitting evidence of defendant's participation in a three-way sexual encounter with Chambers to rebut defendant's testimony that he was afraid of Chambers; the death eligibility requirement for the imposition of a natural life sentence was met; and the trial court erred in sentencing by imposing sentences of terms of years consecutive to defendant's sentence of natural life in prison.

The judgment of the trial court is affirmed, the sentence is modified and the mittimus corrected under the authority of Supreme Court Rule 615(b)(1) (134 Ill. 2d R. 615(b)(1)).

Affirmed; sentence modified and mittimus corrected.

WOLFSON and GARCIA, JJ., concur.