THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RON ADAMS, Defendant-Appellant.

First District (1st Division)   No. 1—06—2620

Opinion filed August 14, 2009, *nunc pro tunc* July 20, 2009.—Rehearing denied August 28, 2009.

218

Patricia Unsinn and Shawn O'Toole, both of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (James E. Fitzgerald and Samuel Shim, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GARCIA delivered the opinion of the court:

The defendant, Ron Adams, appeals from his convictions for first degree murder and aggravated battery with a firearm following a simultaneous trial with codefendants Terrance Space and Harvey Space before separate juries. The defendant asserts numerous errors on appeal including insufficiency of the evidence, improper jury instruction, failure to declare a mistrial, erroneous denial of his motion to quash arrest and errors in evidentiary rulings. Because we find no merit in any of the defendant's arguments, we affirm his convictions.

## BACKGROUND

The defendant and codefendants Terrance Space and Harvey Space were charged with the murder of Aaron Newman and aggravated battery with a firearm of Martice Chatman. Mr. Newman and Mr. Chatman were shot at a party in the early morning of July 5, 2002. There were approximately 100 persons gathered in the alley behind 3606 West Douglas in Chicago.

### Motion to Quash the Arrest

At a pretrial hearing on the defendant's motion to quash his warrantless arrest, Detective James Egan testified that at 11 a.m. on August 8, 2002, he and four other officers went to the defendant's

apartment building. The officers entered the building's unlocked outer door and knocked on the defendant's apartment front door. When the defendant's wife Shameeka Adams answered, Egan asked whether the defendant was inside. Egan testified that Ms. Adams pointed to her right, said "yeah, he's right here," and stepped aside, leaving the doorway unobstructed. The officers entered and arrested the defendant, who was recovering from gunshot wounds to his legs, left arm, and back. After the officers placed the defendant in custody, Ms. Adams began yelling at them, asking whether they had an arrest warrant.

Ms. Adams, the only other witness to testify at the hearing, stated that an officer knocked at her front door and asked whether she had seen a man run through her apartment. She then heard a knock on her back door and told the officer at the front door to "hold on." Ms. Adams testified that when she opened the back door, three officers entered without her consent and that the officer at the front door also entered. When she argued that the officers did not have a warrant, they put her arms behind her back and pushed her head toward the floor.

Judge Evelyn B. Clay denied the defendant's motion to quash. She credited Detective Egan's version of the events. Judge Clay found that Ms. Adams consented to the entry of the detectives by pointing in the direction of the defendant and stepping aside at the front door. Judge Clay found this was equivalent to saying "come in."

## The First Day of Trial

On March 1, 2006, the first day of the defendant's trial, the State presented testimony from six witnesses: (1) the deceased's mother, Alice Newman; (2) Laquita "Shay" Thomas; (3) Assistant State's Attorney Tony Garcia; (4) Martice Chatman; (5) first responder officer Liberty; and (6) forensic investigator Kathleen Gahagan.

Ms. Newman testified as the life and death witness.

Ms. Thomas testified that in the early morning of July 5, 2002, she was at a party in the alley behind her house at 3606 West Douglas in Chicago. At 12:15 a.m., Ms. Thomas saw a man wearing a sweatshirt with his hood up enter the alley. Ms. Thomas heard gunshots and began running. She denied seeing the man in the hooded sweatshirt take his hood off and shoot Aaron Newman. She also denied telling police that the defendant, whom she knew by the nickname "D-Dot," was the man in the sweatshirt. Ms. Thomas testified that she was shown a photo array which she signed, but she denied drawing an arrow to the defendant's picture. She denied identifying the defendant in a lineup or naming him as a shooter in a written statement.

Assistant State's Attorney Tony Garcia testified that he interviewed Ms. Thomas regarding the shooting. He prepared a handwritten statement based on the interview, which Ms. Thomas reviewed and signed. In that statement, Ms. Thomas said she saw a man in a sweatshirt with the hood up enter the alley, then heard gunshots and saw the person in the sweatshirt firing a gun at Aaron Newman. Ms. Thomas said the defendant was the shooter, who had taken off his hood. In the statement, Ms. Thomas also said that she identified the defendant in a photo array and at a lineup.

Martice Chatman testified that he also attended the party behind Ms. Thomas's residence. While standing near his cousin, Mr. Chatman turned and saw a man firing a handgun toward him. Because the man wore a sweatshirt with the hood up, Mr. Chatman could not identify him. Mr. Chatman was shot in the shoulder and leg as he ran from the alley.

Officer Liberty testified that he arrived at the alley following a report of shots fired. Officer Liberty learned that there were two gunshot victims and secured the crime scene.

Forensic investigator Kathleen Gahagan, qualified as an expert, testified that she collected bullet casings, bullet fragments, and a shotgun from the alley on July 5, 2002.

### The Defendant's Motion for a Mistrial

At the start of the second day of trial, the parties learned that the notepads belonging to four jurors were missing. The defendant moved for a mistrial. Before ruling on the motion, Judge Clay interviewed the four jurors in her chambers on the record with the attorneys present. The jurors recalled the evidence to varying degrees but none could identify all six of the previous day's witnesses by name. However, Judge Clay concluded that all four jurors "expressed the ability to recollect the evidence independent of notes." Judge Clay denied the defendant's motion for a mistrial, finding the defendant could "continue to have a fair trial."

### Continuation of Trial

When trial resumed, Derrick Smith testified that while he was at the party, at around midnight, he saw codefendant Terrance Space ride a bike into the alley, stop next to victim Aaron Newman, and engage in an "unfriendly" conversation with Mr. Newman before leaving the alley. About 20 minutes later, a man in a sweatshirt with the hood up walked eastbound into the alley. When the man was "four to five feet" away from Mr. Smith, the man removed his hood and pulled a silver handgun from his pocket. Mr. Smith saw the man's face and identified him as the defendant, Ron Adams, whom he had known for over 10 years. Mr. Smith testified that the defendant was carrying a

9-millimeter Ruger; he denied testifying before the grand jury that the defendant was carrying a 9-millimeter Baretta.

Mr. Smith testified he saw the defendant begin firing his gun, after which Mr. Smith hid behind garbage cans in the alley. From behind the garbage cans, Mr. Smith saw Terrance Space walk northbound into the alley and fire a "Tech 9" gun at Mr. Newman. Mr. Smith also saw Harvey Space walk eastbound into the alley from a vacant lot. Harvey fired a "large caliber handgun" at Mr. Newman. All three shooters then ran from the alley.

Mr. Smith acknowledged that he was a convicted felon and had been arrested three times since July 5, 2002. Mr. Smith testified that he neither received nor expected to receive any favors from prosecutors in exchange for testifying in the defendant's case.

On cross-examination, Mr. Smith testified that because he was "in shock" after the incident he did not speak to police until July 22, 2002, and did not make a handwritten statement until August 11, 2002. In his first interview with police officers, Mr. Smith did not say that the defendant removed his hood before he began shooting. Mr. Smith acknowledged that his testimony about being four to five feet away from the defendant when the shooting began differed from his handwritten statement and his grand jury testimony. Mr. Smith also acknowledged that in his handwritten statement he wrote that he ran through a gangway when the shooting began; he did not say he hid behind garbage cans as he testified at trial.

Chicago police sergeant Don Jerome testified that he questioned the defendant on August 8, 2002. The defendant initially said he was not at the party but was robbed and shot in the early morning of July 5, 2002. The defendant said he did not report the incident to police but was treated at UIC Hospital. When Sergeant Jerome was unable to confirm that the defendant was treated at UIC Hospital, he questioned the defendant again; the defendant then said he was shot while "walking to a party."

### Alleged Hearsay Testimony

Detective Ricky Galbreath testified that he interviewed the defendant on August 10, 2002. Over defense counsel's objection, Galbreath testified that the defendant said someone told his family that he was paid to shoot Mr. Newman. The defendant said that his family erected a public memorial for him in an effort to convince their neighbors that he was killed in the shooting.

### Forensic Evidence

Forensic scientist Kurt Zeilinski, qualified as an expert, testified that he analyzed the evidence from the scene and confirmed that at

least five weapons were used: a "380 automatic, 45 automatic, 9 millimeter [R]uger, [a] 40 Smith and Wesson," and a shotgun. Although Mr. Newman and Mr. Chatman sustained several gunshot wounds, only a single bullet was recovered from Mr. Newman's body. Zeilinski testified that the bullet was "380 slash 38 caliber" and matched the 380 automatic casings recovered at the scene.

### The Defendant's Case in Chief

Officer Olson testified that on October 1, 2002, he arrested Christopher Saunders and recovered a ".40 caliber Smith and Wesson" handgun from his person. Forensic scientist Beth Patty gave expert testimony indicating that cartridge cases recovered from the scene of the shooting were fired from the recovered handgun. The State objected to defense counsel's question seeking to elicit from Officer Olson that Mr. Saunders was arrested on the same block as the shooting on July 5, 2002. Judge Clay sustained the objection, reasoning that the jury might speculate that the gun remained on the scene for four months. Judge Clay also ruled that the location of Mr. Saunders's arrest was immaterial to the ultimate issue of the defendant's guilt.

Terrell Collier testified that he was driving on the same block where the party took place in the early morning of July 5, 2002. He saw the defendant on the ground, bleeding from apparent gunshot wounds. The defendant was unarmed, dressed in shorts and a T-shirt. Collier testified that he and another man drove the defendant to Bethany Hospital.

### Jury Instructions and Verdict

Defense counsel objected to the jury being instructed on an accountability theory, arguing that the State had not presented evidence linking the defendant to the codefendants. Judge Clay overruled the objection and instructed the jury that a defendant "may be convicted for the offense committed by [an]other person even though the other person, who it is claimed committed the offense, has not been prosecuted." Illinois Pattern Jury Instructions, Criminal, No. 5.06 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 5.06).

The jury found the defendant guilty of first degree murder and aggravated battery with a firearm. Judge Clay sentenced the defendant to 30 years' imprisonment for first degree murder and a consecutive 15-year term for aggravated battery with a firearm. This timely appeal followed.

### ANALYSIS

The defendant raises seven errors on appeal: (1) the State failed to prove beyond a reasonable doubt that he was accountable for the

crimes; (2) the eyewitness identifications presented by the State were unreliable and insufficient to sustain his conviction; (3) Judge Clay erred by failing to declare a mistrial when four jurors' notebooks were lost at the start of the second day of trial; (4) Judge Clay gave an improper jury instruction on accountability for uncharged accomplices; (5) Judge Clay improperly denied his motion to quash his warrantless arrest because his wife did not consent to the police officers' entry into their apartment; (6) Judge Clay improperly excluded evidence of the location of the arrest of a man not charged in this case who was in possession of a gun fired at the scene of the crime; and (7) Judge Clay admitted double hearsay at trial. We address the errors in the order in which each arose.

### Denial of Motion to Quash

In reviewing a trial court's decision to deny a motion to quash or suppress, we are faced with a mixed question of law and fact. *People v. Sanchez*, 362 Ill. App. 3d 1093, 1100, 841 N.E.2d 478 (2005). "[A] reviewing court may reject the trial court's findings of fact only if they are against the manifest weight of the evidence." *People v. Harris*, 228 Ill. 2d 222, 230, 886 N.E.2d 947 (2008). However, "we review *de novo* the trial court's ultimate ruling." *Harris*, 228 Ill. 2d at 230.

Generally, an arrest in a residence is prohibited absent a warrant, exigent circumstances, or a resident's voluntary consent to enter. *People v. Williams*, 383 Ill. App. 3d 596, 625, 891 N.E.2d 904 (2008). If a warrantless arrest is justified by consent, the State must prove that the consent was voluntarily given. *People v. Kessler*, 147 Ill. App. 3d 237, 240, 497 N.E.2d 1323 (1986). Voluntary consent "must be received, not extracted 'by explicit or implicit means, by implied threat or covert force.' " *People v. Anthony*, 198 Ill. 2d 194, 202, 761 N.E.2d 1188 (2001), quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 36 L. Ed. 2d 854, 863, 93 S. Ct. 2041, 2048 (1973). Nonverbal conduct may convey consent to search. "[B]ut 'mere acquiescence to apparent authority is not necessarily consent.' " *Anthony*, 198 Ill. 2d at 202, quoting *People v. Kelly*, 76 Ill. App. 3d 80, 87, 394 N.E.2d 739 (1979).

■ Where the State contends voluntary consent was granted by nonverbal conduct, the intention to grant consent "should be unmistakably clear." *Anthony*, 198 Ill. 2d at 203. Unmistakably clear intent is required because "dueling inferences so easily arise from a single ambiguous gesture." *Anthony*, 198 Ill. 2d at 203. Whether consent was voluntarily given "is a question of fact to be determined by the trial court from the totality of [the] circumstances." *Williams*, 383 Ill. App. 3d at 626.

■ In the case before us, Judge Clay ruled that Ms. Adams's nonverbal conduct at the front doorway of the apartment she shared with the defendant conveyed to Detective Egan that he and his fellow officers were welcome to enter. Detective Egan testified that he asked Ms. Adams whether "D-Dot" was in the apartment. In response, Ms. Adams pointed to her right, said "yeah, he's right here," and stepped aside, leaving the doorway unobstructed for the officers to enter. On cross-examination, Detective Egan admitted that prior to going to the apartment, neither he nor the lead detective, to the best of his knowledge, attempted to obtain a warrant for the defendant's arrest. Nor was Detective Egan aware that the defendant had been shot. Detective Egan admitted that at no point did Ms. Adams verbally give her consent for the officers to enter. According to Detective Egan, at the doorway, he informed Ms. Adams that he needed to speak with D-Dot, she "stepped aside, said 'Okay,' and pointed to him." As Detective Egan entered, he was able to see the defendant standing in the entrance to the bathroom, on a pair of crutches. Detective Egan also testified that when he informed Ms. Adams that he was going to arrest the defendant, Ms. Adams began to yell, insisting that she be shown a warrant for the defendant's arrest.

Very little of Ms. Adams's testimony matched Detective Egan's. She testified that officers entered the apartment through both the front and rear doors and that she never consented to their entry expressly or impliedly. She testified that she answered the knock on the front door when she heard an individual announce "the police." The single officer present at the front door asked whether a man ran through her apartment. While at the front door, Ms. Adams heard a loud banging at the rear door. As she left the front door to answer the rear door, she told the officer at her front door to "hold on." She went to the rear door and heard "the police." When she opened the rear door, three officers entered the apartment. At the same time, the officer at the front door entered the apartment. At no time did she give any of the officers permission to enter. Ms. Adams observed the officer from the front door push open the door to the bathroom where the defendant was. The officers announced they were conducting a murder investigation. At some point, the officers announced the defendant would have to go with them. Ms. Adams said he did not have to go with them if they did not have a warrant for his arrest. Ms. Adams was forcibly restrained. The defendant was handcuffed and removed from the apartment.

Following arguments, Judge Clay denied the motion. Judge Clay, apparently giving full credence to Detective Egan's testimony, concluded Ms. Adams's conduct of opening the front door, stepping

aside and pointing to where the defendant stood was "the equivalent of the verbal 'come in.' " See *People v. Kveton*, 362 Ill. App. 3d 822, 830, 840 N.E.2d 714 (2005) ("The [trial] court's ultimate ruling supports the inference that [the arresting officer] was found to be more credible than the defendant and [his witness]"). Judge Clay did not, however, set forth on the record her "findings of facts and conclusions of law upon which the order [denying the motion to quash arrest was] based" as required by section 114—12(e) of the Criminal Code of 1961. 725 ILCS 5/114—12(e) (West 2006).

The defendant, acknowledging that Judge Clay's ruling denying the motion conveys certain implicit findings, contends that even accepting Detective Egan's version of the events at the apartment at face value, Judge Clay erred in denying the motion to quash. The defendant argues that Judge Clay mistakenly concluded "that [Ms. Adams] consented to the entry by stepping aside and pointing inside after answering the door [because her] actions were in response not to a request to enter, but rather in response to a query regarding [the defendant's] location. Because this nonverbal conduct did not produce an 'unmistakably clear' signal of consent, the trial court erred in denying the motion." As support for this claim, the defendant cites *Anthony*, 198 Ill. 2d at 202.

As we noted, the defendant does not contend that Ms. Adams's version of the encounter at the apartment is more credible than the version offered by Detective Egan. He does not contend that Judge Clay's finding of voluntary consent is against the manifest weight of the evidence. Rather, based on *Anthony*, his claim is that Judge Clay erred in denying his motion to quash because Detective Egan's testimony regarding Ms. Adams's ambiguous gesture at the doorway of pointing and moving to the side did not demonstrate an unmistakably clear intent to grant her consent to the officers' entry into the apartment. Because the defendant concedes that Judge Clay properly found Detective Egan's testimony credible, we construe the evidence, along with any reasonable inference that may arise from Detective Egan's testimony, in the State's favor. *Kveton*, 362 Ill. App. 3d at 830.

Judge Clay made an express finding that Ms. Adams voluntarily consented to the officer's entry to the apartment she shared with the defendant. Ms. Adams testified she was unaware that the defendant was the subject of a murder investigation. She was aware, however, that he had been shot. Ms. Adams may have believed that the defendant was merely the victim of a shooting, not also the assailant in one. Detective Egan testified that it was not until Ms. Adams was informed that they were taking the defendant from the apartment that she demanded to see a warrant for his arrest. Of course, once the

officers were granted access by voluntary consent to the apartment, no warrant of any type was required to arrest the defendant on the probable cause the police clearly had amassed up to that point. " 'Because a voluntary consent to a warrantless search and seizure waives the constitutional privilege, the evidence derived therefrom is thus admissible at trial.' " *Williams*, 383 Ill. App. 3d at 627, quoting *People v. Hernandez*, 278 Ill. App. 3d 545, 552, 663 N.E.2d 86 (1996). The question before Judge Clay was whether Detective Egan and his fellow officers " 'reasonably believed [that] they had been given consent to enter.' " *Williams*, 383 Ill. App. 3d at 626, quoting *People v. Henderson*, 142 Ill. 2d 258, 299, 568 N.E.2d 1234 (1990).

Judge Clay was apparently persuaded by Detective Egan's testimony that no unlawful police authority was used in gaining entry to the apartment. Ms. Adams's pointing toward the inside of the apartment as the location of the defendant, coupled with her unprompted movement away from the door, "evidenced [her] intention that the police should enter." *Kessler*, 147 Ill. App. 3d at 241 (where officers stated they would like to speak to the defendant inside his hotel room and the defendant moved clear of the door, allowing the officers to walk inside, the defendant voluntarily consented to the officers' entry). Nor is there any basis to find that Ms. Adams acquiesced to an apparent show of police authority. While it was clear that Detective Egan and those with him were Chicago police officers, no testimony was elicited that Detective Egan claimed authority to enter the apartment by virtue of being a police officer. See *Kessler*, 147 Ill. App. 3d at 242 (defendant did not acquiesce to authority where the police "made no representations regarding their authority"). No testimony was elicited that suggested Ms. Adams had no choice in granting the officers access to the apartment. Ms. Adams's protest only began, based on the version accepted by Judge Clay, when it was clear that the officers intended to arrest the defendant rather than assist him.

We find the two cases upon which the defendant relies, *Anthony* and *People v. Raibley*, 338 Ill. App. 3d 692, 788 N.E.2d 1221 (2003), factually distinguishable. In *Raibley*, the nonverbal conduct at issue was the defendant's shrug of his shoulders. The shoulder shrug followed a series of "increasingly accusatory questions." *Raibley*, 338 Ill. App. 3d at 702. In response to the officer's request to view a video tape, the defendant in *Raibley* responded with no more than a shrug of his shoulders. *Raibley*, 338 Ill. App. 3d at 700. The Fourth District concluded that the shrug was the equivalent of " 'What does it matter if I consent or not? You're going to take the videotapes and view them, anyway.' " *Raibley*, 338 Ill. App. 3d at 702. This highly ambiguous conduct fell far short of an " 'unmistakably clear' manifestation of

consent." *Raibley*, 338 Ill. App. 3d at 702. In *Anthony*, the supreme court determined that " 'assum[ing] the position' of an arrestee" amounted to no more than acquiescence to police authority, not voluntary consent to search the defendant's person. *Anthony*, 198 Ill. 2d at 203-04. Here, we find little ambiguity in Ms. Adams's conduct at the doorway based on Detective Egan's version of the encounter, which Judge Clay found credible. The officers reasonably understood Ms. Adams's conduct as conveying consent to their entry.

The circumstances surrounding the doorway encounter also give credence to the finding that Ms. Adams consented to the entry by the officers. According to Detective Egan's testimony, the officers never implored Ms. Adams to give them consent to enter. Nor was a coercive atmosphere created by the simple question asked of her at the front doorway: "Is D-Dot here?" Perhaps because Ms. Adams was unaware of the nature of the investigation being conducted by Detective Egan, she did not interpret Detective Egan's questions as putting the defendant's liberty at risk. The totality of the circumstances as determined by Judge Clay leading to her denial of the motion supports her finding that Ms. Adams unmistakably consented to the officers' entry.

While the defendant attempts to undermine this finding by claiming that Ms. Adams's nonverbal conduct amounted to no more than a response to the "query regarding [the defendant's] location," this claim fails to explain Ms. Adams's movement away from the doorway, leaving an unobstructed path for the officers to enter. Judge Clay determined that Ms. Adams signaled "come in." We see no basis to overturn this finding.

In light of the finding that Ms. Adams voluntarily consented to the officers' entry into the apartment, we cannot say Judge Clay erred in denying the defendant's motion to quash. *Williams*, 383 Ill. App. 3d at 625.

## Denial of Motion for a Mistrial

■ The defendant next contends that Judge Clay should have granted his motion for a mistrial when four jurors lost their notebooks after six of the State's witnesses testified. We disagree.

A trial court's denial of a motion for a mistrial "is reviewed only for abuse of discretion" because the trial court is " 'far more conversant with the factors relevant to the determination' than any reviewing court can possibly be." *People v. Segoviano*, 189 Ill. 2d 228, 241, 725 N.E.2d 1275 (2000), quoting *Arizona v. Washington*, 434 U.S. 497, 514, 54 L. Ed. 2d 717, 733, 98 S. Ct. 824, 834 (1978). Reversal is warranted only where it is reasonably apparent that "some of the

jurors have been influenced or prejudiced such that they could not be fair and impartial." *People v. Walker*, 386 Ill. App. 3d 1025, 1029, 901 N.E.2d 429 (2008). A juror's assurance that she can decide a case impartially based on the evidence is given "important but not conclusive consideration." *Walker*, 386 Ill. App. 3d at 1029.

The parties do not cite, nor have we found, an Illinois case that directly addresses misplaced juror notes. The state of the law, however, is that a juror is not obliged to take notes. "Just because a juror has taken notes does not necessarily mean that his or her recollection of the evidence is any better or more accurate than the recollection of a juror who did not take notes." IPI Criminal 4th No. 1.05. It is the independent memory of each juror that is critical in carrying out a juror's oath to be fair and impartial. Jurors are asked to keep their notes confidential, "to prevent [other] jurors from being overly influenced by written notes instead of using their memory of the facts to decide the case." *People v. Flores*, 381 Ill. App. 3d 782, 789, 886 N.E.2d 1143 (2008).

There is no basis to conclude that Judge Clay abused her discretion in denying the defendant's motion for a mistrial. The four affected jurors said they independently recalled the evidence. Nor was there a request by the jury for a transcript of the testimony from the first day of trial during its deliberations that might suggest a disagreement in the recollection of the jurors. We reject the defendant's comparison of the inability of the affected jurors to recall the names of all the witnesses that testified during the first day of trial to sleeping "during *almost the entire*" trial. (Emphasis in original.) *People v. Jones*, 369 Ill. App. 3d 452, 456, 861 N.E.2d 276 (2006).

We also reject the defendant's argument that Judge Clay improperly advised the jurors to keep their notes confidential. This admonishment is consistent with the policy that each juror rely upon her individual memory of the evidence. See *Flores*, 381 Ill. App. 3d at 789 (permitting the trial court to advise the jury against sharing their notes). Judge Clay was in the best position to assess the fairness of the defendant's trial. *Segoviano*, 189 Ill. 2d at 241. We find no basis to conclude that Judge Clay erred in denying the defendant's motion for a mistrial.

## Location of Mr. Saunders's Arrest

■ The defendant next contends he was prejudiced when Judge Clay barred him from introducing evidence of the location of Mr. Saunders's arrest—the same block as the July 5, 2002, shooting—while in possession of a gun involved in the shooting.

Generally, rulings on the admissibility of evidence are within the trial court's sound discretion. *People v. Johnson*, 385 Ill. App. 3d 585, 596, 898 N.E.2d 658 (2008). We will not reverse those rulings unless the court abused its discretion, meaning that its rulings were "arbitrary, fanciful, or unreasonable." *Johnson*, 385 Ill. App. 3d at 596.

Judge Clay ruled that Mr. Saunders's arrest on the same block as the shootings on July 5, 2002, was immaterial. She reasoned that his arrest on the same block does not, standing alone, support an inference that Mr. Saunders was involved in the shooting, especially where there was no evidence that he attended the party on July 5, 2002. Evidence of the arrest location may also have distracted jurors from the material evidence in the case, namely, the eyewitness identifications of the defendant. Judge Clay concluded that it was sufficient that the jury was apprised of Mr. Saunders's arrest while in possession of a gun used at the crime scene, in the absence of any other evidence linking him to the shooting.

Based on the record before us, we conclude Judge Clay did not abuse her discretion by excluding the location of his arrest.

### Admission of Alleged Hearsay Evidence

■ Next, the defendant contends that Judge Clay committed reversible error when she allowed Detective Galbreath to testify that the defendant said someone told his family that he was paid to shoot Mr. Newman.

The State argues that the defendant has forfeited review of this issue by failing to raise it in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988). In order to circumvent forfeiture, the defendant must show that Judge Clay's ruling amounted to plain error. *People v. Wesley*, 382 Ill. App. 3d 588, 593, 888 N.E.2d 681 (2008). The plain error doctrine allows courts to consider forfeited errors if either the evidence was so closely balanced that the error may have affected the outcome or the error was so serious that the defendant was denied a substantial right to a fair trial. *Wesley*, 382 Ill. App. 3d at 593.

As we make clear below, the evidence of the defendant's participation in the shootings is overwhelming. Even if Detective Galbreath's testimony was hearsay and violated the defendant's right to confrontation, the defendant cannot make the requisite showing under the first prong of plain error. *Wesley*, 382 Ill. App. 3d at 593; *People v. Cox*, 377 Ill. App. 3d 690, 705, 879 N.E.2d 459 (2007). Nor does Detective Galbreath's testimony trigger the second prong of the plain error rule because the claimed error was not "of such a magnitude that

defendant was denied a fair and impartial trial." *People v. McCullum,* 386 Ill. App. 3d 495, 508, 897 N.E.2d 787 (2008).

The claimed error based on the defendant's own statements was at best harmless. Where the error is harmless, no fundamental error can be found. *Cox,* 377 Ill. App. 3d at 705.

## Accountability Jury Instructions

■ We next address the defendant's contention that he was prejudiced when Judge Clay instructed the jury that the defendant could "be convicted for the offense committed by [an]other person even though the other person, who it is claimed committed the offense, has not been prosecuted." IPI Criminal 4th No. 5.06.

The State argues that the defendant also forfeited review of this issue by failing to raise it in a posttrial motion. *Enoch,* 122 Ill. 2d at 186. Supreme Court Rule 451(c) permits review of substantial defects in jury instructions "if the interests of justice require." 210 Ill. 2d R. 451(c). That rule is construed identically to the plain error rule, which as discussed above allows us to consider forfeited errors if either the evidence was closely balanced or the error substantially denied the defendant's right to a fair trial. *People v. Chatman,* 381 Ill. App. 3d 890, 896, 886 N.E.2d 1265 (2008). However, the rule only applies if an error occurred. *Chatman,* 381 Ill. App. 3d at 896.

The general rule is that "some evidence" must be presented to justify giving a jury instruction. *People v. Mohr,* 228 Ill. 2d 53, 65, 885 N.E.2d 1019 (2008). Reviewing courts apply an abuse-of-discretion standard to a trial court's decision on which instruction to give. *Mohr,* 228 Ill. 2d at 65-66. As we establish in our discussion below, the evidence supported an accountability instruction.

Judge Clay did not err by giving IPI Criminal 4th No. 5.06. Because no error was committed, there can be no plain error.

## Sufficiency of the Evidence

■ Finally, we address jointly the defendant's related contentions that eyewitness identifications upon which his convictions were based were unreliable and that the State's evidence was insufficient to prove him accountable for first degree murder and aggravated battery beyond a reasonable doubt.

In a challenge to the sufficiency of the evidence, a reviewing court does not retry the defendant; rather, it considers the evidence in the light most favorable to the prosecution to determine whether " *'any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Ross,* 229 Ill. 2d 255, 272, 891 N.E.2d 865 (2008), quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789

(1979). The trier of fact determines the credibility of witnesses and the weight of their testimony and resolves any conflicts in the evidence. *Ross*, 229 Ill. 2d at 272. A reviewing court will uphold a conviction unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt. *Ross*, 229 Ill. 2d at 272.

The defendant argues that Ms. Thomas's recantation testimony undermined the reliability of her earlier statements to Assistant State's Attorney Tony Garcia. Given the general unreliability of recantation testimony (*People v. Brooks*, 187 Ill. 2d 91, 132, 718 N.E.2d 88 (1999)) and the jury's superior position to resolve conflicts in the testimony (*Ross*, 229 Ill. 2d at 272), the jury could assign little weight to Ms. Thomas's recantation and consider Garcia's testimony that she credibly identified the defendant. We cannot say Ms. Thomas's written statement was entitled to no consideration by the jury; such a ruling would amount to substituting our judgment for the jury's on issues of credibility and testimonial weight. *Ross*, 229 Ill. 2d at 272.

Similarly, the defendant claims Mr. Smith was not credible by pointing to the conflicts between Mr. Smith's trial testimony and his earlier statements concerning his distance from the defendant and his description of the defendant's gun. Once again, believability of Mr. Smith was for the jury to decide, taking into account his prior inconsistent statements and grand jury testimony. *Ross*, 229 Ill. 2d at 272. From its verdict, it appears the jury favored Mr. Smith's trial testimony. The jury was also free to accept Mr. Smith's testimony that the shooter's hood was down once the shooting started over Martice Chatman's testimony that the shooter kept the hood up. *Ross*, 229 Ill. 2d at 272. Mr. Smith's criminal history is no bar to believability, especially where he testified that he was not rewarded for testifying in this case. That Mr. Smith omitted his hiding place behind the garbage cans and the make of Terrance Space's gun from his earlier statements was also presented to the jury. The jury was free to pick and choose which portions of Mr. Smith's testimony it found credible. That Mr. Smith was impeached by prior statements is an insufficient basis to disturb the jury's guilty finding on appeal. *Ross*, 229 Ill. 2d at 272.

The defendant also claims that Mr. Smith's and Ms. Thomas's identifications were unreliable based on the reliability factors in *Neil v. Biggers*, 409 U.S. 188, 34 L. Ed. 2d 401, 93 S. Ct. 375 (1972).

In *Biggers*, the Supreme Court set out five factors that should be considered in determining whether an eyewitness's identification is reliable: (1) the witness's opportunity to see the offender; (2) the witness's degree of attention; (3) the accuracy with which the witness previously described the offender; (4) the witness's certainty level at the identification confrontation; and (5) the time that elapsed before

that confrontation. *Biggers*, 409 U.S. at 199-200, 34 L. Ed. 2d at 411, 93 S. Ct. at 382; *Cox*, 377 Ill. App. 3d at 697 (adopting *Biggers*).

Although Mr. Smith's and Ms. Thomas's opportunity to view the man in the hooded sweatshirt was limited, that alone does not render their identifications unreliable. *People v. Barnes*, 364 Ill. App. 3d 888, 894, 847 N.E.2d 679 (2006). Both stated that they had a clear view of the shooter's face when he removed his hood and began firing. Both were familiar with the defendant; Mr. Smith had known him for over 10 years, and Ms. Thomas knew him by the nickname "D-Dot." Because the man in the hooded sweatshirt was the first to fire a gun, Mr. Smith's and Ms. Thomas's attention was surely focused upon him, supporting their identifications. *Biggers*, 409 U.S. at 199, 34 L. Ed. 2d at 411, 93 S. Ct. at 382. Their identifications are also reliable because both accurately described the defendant and confidently identified him for police. *Biggers*, 409 U.S. at 199, 34 L. Ed. 2d at 411, 93 S. Ct. at 382. Although those identifications were not made until weeks after the incident, the other *Biggers* factors support the reliability of Mr. Smith's and Ms. Thomas's eyewitness testimony.

Because the jury was free to find the eyewitnesses' testimony credible and reliable, the jury could rationally find the defendant guilty, either as a principal or as one accountable for the criminal acts of another, of aggravated battery and first degree murder. *Ross*, 229 Ill. 2d at 272. A defendant is accountable for another person's actions if, before or during the crime, the defendant "solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2 (West 2006). The State need not prove a verbal agreement between the parties; the trier of fact can infer a common design from the circumstantial evidence. *People v. Reeves*, 385 Ill. App. 3d 716, 727, 897 N.E.2d 298 (2008).

The evidence showed that Mr. Newman and Terrance were in an argument earlier in the night. Later, the defendant entered the alley carrying a gun and was joined by codefendants Terrance and Harvey in shooting at Mr. Newman. According to Mr. Smith's testimony, the defendant then ran from the scene in the same direction as codefendant Terrance. The State need not prove that the gun the defendant fired caused the victims' injuries; the jury could infer from the circumstances that the three codefendants were working in concert with the common aim of killing Mr. Newman. The evidence was sufficient to find the defendant guilty as a principal as having fired a gun at Mr. Newman and accountable for the shots fired by the Space brothers. *Reeves*, 385 Ill. App. 3d at 727; see also *People v. Curtis*, 296 Ill. App. 3d 991, 1002, 696 N.E.2d 372 (1998) (evidence showing that a defendant and another man shot at a victim from the same car was sufficient to demonstrate accountability).

In contending that the State did not prove him guilty beyond a reasonable doubt, the defendant makes a series of arguments that simply are not supported by the evidence. Although the forensic evidence demonstrated that five guns were used to create the crime scene, this does not translate to five different shooters; one or more of the codefendants may have used multiple guns. The credible testimony at trial described only three shooters who fired at Mr. Newman and ran out of the alley, providing sufficient circumstantial evidence of a common design to support an accountability theory as well as their direct participation in the shootings. The defendant's argument that Christopher Saunders was involved in the incident because he was found in possession of one of the guns several months later is also unavailing. Even if the jury had inferred that Mr. Saunders participated in the incident, this would not exonerate the defendant where credible testimony was given that he was one of the shooters.

The defendant's reliance on *People v. Peterson*, 273 Ill. App. 3d 412, 652 N.E.2d 1252 (1995), and *People v. Lopez*, 72 Ill. App. 3d 713, 391 N.E.2d 105 (1979), is misplaced. In those cases, the circumstantial evidence did not demonstrate a common design between the charged defendants.

In *Peterson*, the defendants were firing at each other when a bystander was struck by a bullet. *Peterson*, 273 Ill. App. 3d at 420-21. Not surprisingly, there was no evidence that the shooters were aiding or abetting each other by shooting at each other. There was no dispute, however, that the evidence established that only one of the shooters struck the bystander. Based on this factual scenario, to prove murder as to the bystander, it was incumbent upon the State to identify which of the two shooters struck the bystander. In other words, the guilty shooter had to be proved guilty as a principal; both defendants could not be convicted of murder under an accountability theory as they were not acting in concert. *Peterson*, 273 Ill. App. 3d at 420-21.

In *Lopez*, one of two identical twins fired a gun at the victim while the other twin watched. *Lopez*, 72 Ill. App. 3d at 717. The evidence did not demonstrate that the nonshooting twin "voluntarily attached himself to his brother." *Lopez*, 72 Ill. App. 3d at 717. In the absence of proof of voluntary attachment, the State had to identify which twin fired the gun. In other words, the guilty twin had to be proved guilty as a principal, which required that he be identified. The State could not succeed on the theory each twin was accountable for the actions of the other, making identification of the shooter unnecessary, where insufficient proof of accountability was adduced. The mere presence of the other twin was "insufficient to prove accountability" to make each twin criminally responsible. *Lopez*, 72 Ill. App. 3d at 717.

Unlike the evidence in those cases, here the evidence was virtually unchallengeable that the defendant was working in concert with his codefendants. All three arrived in the alley and began shooting at Mr. Newman, after one of the three had a heated argument with Mr. Newman. The defendant and Terrance then ran from the alley in the same direction. The defendant's arguments that he was not involved in the shooting, premised upon his own gunshot wounds, is unpersuasive. The defendant points to no record evidence that he was shot by an unknown shooter at the party or evidence that might prove the victims were shot in the course of crossfire between the defendant and an unknown antagonist. The defendant's arguments amount to no more than speculation.

Based on the record, the jury properly resolved the credibility issues in the State's favor. Given the overwhelming evidence of multiple shooters, the evidence was sufficient to sustain the defendant's convictions as a direct participant as well as on an accountability theory.

## CONCLUSION

We find no basis to overturn Judge Clay's decision to deny the defendant's motion to quash his arrest. Based on Detective Egan's version of the events, Judge Clay found Ms. Adams voluntarily consented to the officers' warrantless entry into the home she shared with the defendant. No mistrial was warranted based on the lost notebooks. Judge Clay acted within her discretion in excluding the location of Saunders's arrest. The defendant made no showing that plain error occurred. The jury was free to find the identification eyewitnesses gave credible testimony. On the record before us, we find no basis to overturn the defendant's convictions.

Affirmed.

R.E. GORDON, P.J., and WOLFSON, J., concur.