2019 IL App (2d) 161022-U
No. 2-16-1022
Order filed November 1, 2019

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of DeKalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 13-CF-623 |
| KEITH TERRELL, | ) ) ) | Honorable Robbin J. Stuckert, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE McLaren delivered the judgment of the court.
Justices Jorgensen and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The trial court did not abuse its discretion by barring defense counsel from asking potential jurors whether they had heard of false confessions because the question would have improperly indoctrinated the prospective jurors to defendant's theory of the case; the trial court did not abuse its discretion by admitting evidence of the victim's prior injuries because there was more than a mere suspicion that defendant caused the victim's prior injuries and the evidence was probative of defendant's intent; trial court affirmed.

¶ 2   Following a jury trial, defendant was convicted of first-degree murder (720 ILCS 5/9-1(a) (West 2016)) of his six-week old daughter, K.T.  The trial court sentenced defendant to 45 years in prison.  In this direct appeal of his conviction, defendant argues (1) that he received an unfair

trial where during *voir dire* the trial court refused to allow defendant to question prospective jurors about false confessions, but allowed the prosecutor to ask whether they had heard of shaken baby syndrome and the last time they had held a baby, (2) the trial court erred by admitting evidence of prior injuries to K.T. to prove defendant's intent, motive, and knowledge, where the prosecutor presented no evidence to connect defendant to the prior injuries, and (3) he received an unfair trial where the trial court admitted into evidence clothing worn by K.T. after her death and the prosecutor commented on the clothing during closing argument and showed the clothing to the jury. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged defendant with three counts of first-degree murder of his six-week old daughter, K.T. (720 ILCS 5/9-1(a)(1), 9-1(a)(2) (West 2016)) and two counts of aggravated battery of a child (720 ILCS 5/12-3.05(b)(1) West 2016)). Prior to trial, defense counsel moved to suppress defendant's videotaped statement he made during a police interview, on the ground that it was involuntarily given. The trial court denied the motion. In the statement, defendant stated, *inter alia*, that he squeezed K.T.'s ribs and shook her twice.

¶ 5      In the State's answer to discovery, it indicated its intention to introduce evidence of "Defendant's prior acts of injuring [K.T.]" as proof of knowledge, intent, motive, scheme or design. Defense counsel did not file a motion *in limine* seeking to bar this evidence. Further, defense counsel did not object when the State presented this evidence through testimony. However, defense counsel asked the trial court to admonish the jurors that this evidence could be used against defendant only for the limited purpose of showing defendant's intent, motive, and knowledge. The State agreed, and thus, each time the State presented evidence of K.T.'s prior injuries, the trial court instructed the jury by stating the following:

"Ladies and gentlemen you will be receiving evidence that the defendant has been involved in conduct other than charged in the indictment. This evidence is being received on the issues of the defendant's intent, motive, and knowledge and may be considered by you only for that limited purpose. It is for you to determine if defendant was involved in that conduct and, if so, what weight should be given on the issues of intent, motive, and knowledge."

¶ 6    The State first called Shanae Scott, K.T.'s mother, who testified as follows. In August 2013 Shanae lived with her boyfriend, defendant, and their two children two-year old Solange and six-week old K.T., who was born healthy on July 9, 2013. Defendant stayed home with K.T. while Scott attended classes at college and worked. During the weekdays Solange attended daycare.

¶ 7    Scott testified that, on Tuesday, August 27, 2013, she attended class, Solange was in daycare, and defendant stayed at home with K.T. Scott arrived home between 4 and 5 p.m. after she picked up Solange from daycare. K.T. "wasn't up to par. Like she was a little under the weather"; she was not eating much and might have had a fever. After calling K.T.'s doctor, Scott gave K.T. infant Tylenol and a warm bath as prescribed by the doctor. The following morning, August 28, Scott took Solange to daycare and went to the library to study at about 1 p.m.. K.T. stayed home with defendant. When Scott returned home from the library between 4 and 5 p.m., K.T. was lying sideways at the foot of the crib with a blanket thrown over her. "It looked like she was she was covered up like – like something being hidden." Scott removed the blanket. K.T. was breathing rapidly and appeared pale. K.T.'s eyes were closed. "It looked like she was trying to open her eyes but she couldn't." Her "body was locked up." K.T.'s legs were straight and her arms were curled. "I asked defendant to call my cousin, Merlynette, because I wanted her to drive

us to the hospital and I was too nervous to dial the phone myself. She came to our home and took us to Kishwaukee Hospital."

¶ 8    Scott also testified that at the Kishwaukee Hospital emergency room, the doctors told her that K.T. had brain and retinal hemorrhaging. K.T. was placed on a ventilator and then airlifted to Rockford Memorial Hospital. On August 30, K.T. was taken off the ventilator and died shortly thereafter.

¶ 9    Scott also testified that after K.T. was pronounced dead, she put lotion and a clean diaper on her and put her in a new sleeper she had bought. Scott then held and kissed K.T. Scott identified State's Exhibit no. 3 as the sleeper she dressed K.T. in after her death. Scott never hit, dropped, nor shook K.T.

¶ 10    Scott testified that about one week before she took K.T. to the emergency room, Scott noticed two circles on the bottom of K.T.'s foot. Scott noticed the two circles after K.T. had been in defendant's care. Defendant had no explanation for the circles on K.T.'s foot. At that time, defendant was a smoker, the only smoker in the home.

¶ 11    DeKalb Police Officer Anthony Densberger testified as follows. Densberger responded to the Kishwaukee Hospital emergency room at the request of medical personnel. Scott was in the exam room with K.T. She was "visibly upset." She was crying. Defendant was "very calm and collected." Defendant spoke with Scott and then went outside. Densberger had a "friendly" conversation with defendant outside while defendant smoked a cigarette. While Densberger and defendant were outside, DeKalb Police Commander Craig Woodruff arrived at the hospital.

¶ 12    Woodruff testified as follows. Woodruff reported to the hospital in response to a report "of a baby showing some signs of potentially being battered." Woodruff and defendant stepped outside and defendant smoked some cigarettes while the two men talked. Woodruff, who was a

sergeant at the time, asked defendant what happened to K.T. Defendant replied that he was alone with the K.T. from 1 p.m. that day and that he fed her and put her down for a nap at 3:30 p.m. Defendant also told Woodruff that he took a nap at around 4:15 or so and woke up when Scott arrived home. Defendant told Woodruff that K.T. had not been sick. Scott told defendant that the baby was not breathing well and her arms were "seized up." When Woodruff asked defendant if K.T. had fallen, defendant "looked off and thought about it for a few minutes and then eventually answered, no – or a few seconds." Then DeKalb Police Detective Paul Mott arrived and the two of them agreed to speak at the police department. Defendant willingly went to the police department.

¶ 13 Mott testified as follows. Mott arrived at the Kishwaukee Hospital emergency room at Woodruff's request due to a report of an infant with bleeding on the brain and broken ribs. Mott observed two or three blister marks on the bottom of K.T.'s foot and purplish-yellow spots on her buttocks. Mott took photographs of K.T. which were admitted into evidence. Mott wanted to speak with defendant because he was the last caregiver to be with K.T. and left the hospital when asked about her injuries. Mott found defendant outside the hospital doors and asked defendant to go with him to the police station to talk. Defendant agreed. Defendant was not handcuffed.

¶ 14 At the station, Mott gave defendant Miranda warnings verbally and in writing. Defendant signed the Miranda waiver form, and then Mott talked with defendant on and off for two hours before starting a video recording. Defendant was 5'7" tall and weighed 160 pounds. Defendant stated that the day before K.T. was brought to the emergency room her breathing was fine. Defendant was not clear regarding dates and times. Mott testified, "In my initial interview with [defendant] the times of some of the events that he stated were on certain days but then in the video-recorded portion of the interview he changed the dates that they occurred." Defendant was

clear that he watched K.T. on Wednesday, August 28, from 2 p.m. to 5 p.m. and the following day from 8 a.m. to 5 p.m.

¶ 15    Mott also testified that prior to the recording defendant described different incidences that may have led to K.T.'s injuries.  Defendant told Mott he was sitting in a chair holding K.T., fell asleep, and K.T. fell on the floor.  When Mott told defendant that a fall from that height would not cause K.T.'s injuries, defendant then told Mott that he stood up from the chair and K.T. fell on the floor.  Defendant also told Mott that K.T. was on a table in a car seat, which fell on the floor. Defendant then told Mott that he had a beer on Tuesday at 3 a.m., walked with K.T. in his arms, tripped over some shoes, and fell with his full weight onto K.T.  At that point, defendant consented to the rest of the interview being recorded.  The trial court admitted the video-recorded interview and a transcript of the video-recording into evidence.

¶ 16    During the video-recorded interview, defendant stated the following.  After defendant fell on K.T., he checked her and did not see any bruises or bleeding, so he thought she was okay. Defendant did not tell Scott who was sleeping at the time, because he did not want to argue with her, and he was afraid of criticism from her.  Defendant did not initially tell Mott that he fell on K.T. because he did not want to admit that he was a clumsy parent.  On Monday, the day before the "fall," defendant was yelling at Solange while he was holding K.T.  As defendant was yelling at Solange, he unintentionally squeezed K.T. and K.T. took a breath like someone does who is "caught off guard."  Mott told defendant that he talked to the nurse and the injuries to K.T. did not match what defendant described.  Mott also told defendant that defendant needed to tell the truth so that the K.T. could get the treatment she needed.

¶ 17    At that point in the recorded interview, DeKalb Police Lieutenant Robert Redel entered the room and told defendant that there were no external injuries to K.T. to support his claim that he

fell on her and that her injuries were internal and consistent with K.T. being shaken. Redel said he had no doubt that K.T. was "shaken" and that they need to figure out what was going through defendant's mind at the time, so that defendant could get help to learn how to deal with stressful situations *** "to make sure it doesn't happen again." Redel told defendant "[a]nd everyone forgets on [sic] how weak their neck are." Defendant said that the wound on the bottom of K.T.'s foot happened when she stepped on defendant's unlatched belt buckle while he was holding her. Redel said, "Kids aren't easy, *** I've lost it." Then, defendant stated, on Tuesday at 3 a.m., "I got up, you know, just still kind of tired and sleeping, the baby just yelling to the top of her lungs. And, like I said, I kind of did lose it a little bit, so I, like – seems I give her like – one good – like two shakes, you know that I'm saying? Be, like, chill out. And then she – and it do – make her crying worse. *** I shook her *** twice like this; but the time I shook her, I really did. I kind of – well, squozed [sic]." Lieutenant Redel asked defendant, "where you think the ribs broke?" Defendant replied, "Yeah. I think I squeezed her a little bit." Defendant said that her head went back and forth "once."

¶ 18 The State called Dr. Raymond Davis, an expert in medicine, pediatrics, and child abuse pediatrics, to testify. Prior to Davis' testimony the trial court gave the jury the limiting instruction. Davis testified as follows. On August 29, 2013, Davis examined K.T. in the intensive care unit at the Rockford Memorial Hospital. The Department of Children and Family Services (DCFS) requested a complete medical evaluation for potential child abuse to discover if there were medical illnesses or injuries that could explain her medical problems and rule "out those circumstances as there was some concern or suspicion about abuse." Davis examined K.T. who was on a ventilator. K.T.'s eyes were fixed and dilated. She also had retinal hemorrhaging. Dr. Davis also reviewed K.T.'s CT scans, skeletal survey, and laboratory evaluation. The C.T. images of K.T.s brain

showed bleeding in the front surface of the brain on both sides, between the two hemispheres of the brain, along the inter-hemispheric membrane, and in the back of the brain. Davis stated that there was an area of brighter bleeding in the left front part of the brain the radiologist felt was caused by a contusion. The brain tissue had increased swelling and pressure. Davis also testified that the C.T. scan of K.T.'s chest showed 11 or 12 rib fractures in different stages of healing. This indicated that the fractures happened at different times. There "may have been two newer rib fractures." Davis diagnosed K.T. with "abusive head trauma[,] *** formerly called shaken baby syndrome." Abusive head trauma causes bleeding, tearing of the nerve vessels, swelling inside the brain, and retinal hemorrhaging, because the brain is moving at a different rate than the skull. The swelling presses on the brain stem. This causes irritability, poor feeding, vomiting, fussiness, and, eventually, seizures and cessation of breathing.

¶ 19    Davis also testified that, "the posterior rib fractures are extremely a very highly suspicious and a very concerning sign in young infants because of the mechanism that occurs to produce those. *** That's specific to squeezing or because they squeeze when they shake because they're holding on, you see it when they're shaking." Posterior rib fractures are not seen with fall injuries or "birth injuries."

¶ 20    Davis further testified that K.T. had some spots on the bottom of her right foot. Davis opined, "[t]he size and healing patterns that I saw being six millimeters is pretty much the typical pattern you do see from a healing cigarette injury or burn." When asked if the injuries could have been caused by defendant's belt, Davis replied, "if it caused an abrasion or a puncture wound with bleeding, it could have been caused by the belt *** [.] I can't say it couldn't have."

¶ 21    The State called forensic pathologist, Dr. Mark Peters as a witness. Prior to his testimony the court instructed the jury in the same manner as it had prior to Dr. Davis' testimony. Peters, an

expert in forensic pathology, testified as follows. Peters had conducted an autopsy on K.T. At the State's request, and without objection by defense counsel, the trial court admitted into evidence a photograph of K.T. before the autopsy began and a body diagram. Peters prepared during the autopsy (People's exhibit nos. 18 and 19, respectively). The photograph and diagram. were published to the jury. The diagram. indicated three scars on K.T.'s bottom right foot, two contusions of her right ankle, and multiple scars and contusions on her buttocks and lower back. The two right ankle contusions were likely caused by a former intravenous site from the hospital. A contusion is caused by blunt trauma or an impact injury. At the State's request, and without objection by defense counsel, the trial court admitted into evidence a photograph of K.T.'s left foot, and two photographs of K.T.'s buttocks after incisions had been made during the autopsy (People's exhibit nos. 20, 21 and 22, respectively). The scars on the foot were completely healed and were probably a few weeks old. The incisions on K.T.'s buttocks showed hemorrhaging beneath the skin, which confirmed Peters' diagnosis of contusions.

¶ 22    Peters also testified as follows. K.T. had multiple anterior and posterior rib fractures. "[P]osterior rib fractures are a well-recognized marker of child abuse or abusive injury." Peters opined to a reasonable degree of medical and scientific certainty that K.T. died from "blunt trauma of the head," which is an "impact injury but with children it can also consist of shaking injury." Such blunt trauma to the head is fatal to an infant because it causes a shearing of the blood vessels and nerves throughout the brain. Shaking a baby can cause these injuries. Also, "infants' brains are very soft when compared to an adult brain." During cross-examination Davis testified that any kind of blunt trauma, including a fall from a sufficient height, could have caused K.T.'s head trauma injury.

¶ 23    Detective Michael Stewart of the DeKalb Police Department testified as follows. Stewart attended K.T.'s autopsy. Another detective, Detective Reyes, collected the sleeper K.T. had been wearing and Stewart entered it into evidence. After Stewart identified the sleeper, marked as State's exhibit no. 3, the court granted the State's motion to admit the sleeper into evidence without objection from defense counsel.

¶ 24    During closing argument, the prosecutor, without objection, held up the sleeper that Scott had dressed K.T. in after she was pronounced dead. The prosecutor stated:

"I just want to be up front about the fact that there's a lot of emotion attached to this sleeper. We all heard the story from [Scott] about the last act she took with [K.T.], her last acts of trying to mother [K.T.] during [K.T.'s] time here on earth, but this sleeper is not here for that purpose. The sleeper is here for you to look at and consider as the jury in this case so that you can see exactly what size [K.T.] was and so you can compare it to the size of the defendant so you can see how big he is and how small she was."

¶ 25    The jury found defendant guilty of first-degree murder and aggravated battery of a child. Defendant filed a motion for a new trial which the court denied. The trial court sentenced defendant to 45 years' imprisonment on the first-degree murder conviction, finding that the aggravated battery counts merged with the first-degree murder conviction. Defendant filed a timely appeal.

¶ 26                                    II. ANALYSIS

¶ 27                                    A. *Voir Dire*

¶ 28    Defendant argues that he received an unfair trial because during *voir dire* the trial court (1) did not permit defense counsel to ask potential jurors about false confessions, but (2) permitted the

prosecutor to ask potential jurors about the last time they held a baby and whether they had heard of shaken baby syndrome.

¶ 29    We begin by considering defendant's contention that the trial court erred by barring defense counsel from asking potential jurors about false confessions.  The manner and scope of *voir dire* examination rests with the sound discretion of the trial court, and, therefore, we will not disturb its decisions regarding *voir dire* examination absent an abuse of discretion.  *People v. Rinehart*, 2012 IL 111719, ¶ 16.  The purpose of *voir dire* examination is to choose an impartial jury, not to indoctrinate the jury or choose a jury with a particular predisposition.  *Id*.  See also *People v. Polk*, 407 Ill. App. 3d 80, 106 (2010); *People v. Reeves*, 385 Ill. App. 3d 716, 730 (2008).  Thus, a trial court properly limits counsel from questions that are designed to ensure that jurors are receptive to the defendant's theory of defense.  *Polk*, 407 Ill. App. 3d at 106; *Reeves*, 385 Ill. App. 3d at 730.

¶ 30    In *Polk*, the defendant argued that the trial court abused its discretion by denying his request to ask the jurors about their attitudes about false confessions.  *Id*. at 106.  Defense counsel asked the trial court to ask potential jurors the following questions.  "Do you believe someone might confess to something he did not do?"  "If you were to hear evidence that [defendant] made a confession or statement related to this case, would you be able to consider whether it is a true or false confession or statement based on all the circumstances?" *Id*. at 106.  The appellate court held that the trial court did not abuse its discretion because "the questions would have improperly indoctrinated the potential jurors to defendant's affirmative defense." *Id*. at 107.

¶ 31    In this case, defense counsel questioned one potential juror about false confessions; asking, "Have you heard of the phrase, the concept of false confessions?"  Defense counsel also asked the same potential juror, "Can you foresee a situation on which someone could give a false confession?"  When the potential juror answered "no," defense counsel asked, "Well, you've

certainly probably never been arrested or questioned, right?" After the potential jury replied "no," defense counsel asked, "You've never been down to the police department, put in a little room and asked pointed questions?" These questions were defective because they would have improperly indoctrinated the prospective jurors to defendant's theory of the case or his affirmative defense. Thus, the trial court did not abuse its discretion by disallowing defendant from asking these questions to the other prospective jurors. See *id*. at 107.

¶ 32     We now consider defendant's contention that the trial court abused its discretion by allowing the prosecutor to ask potential jurors about the last time they held a baby and whether they had heard of shaken baby syndrome. However, defense counsel failed to object to these questions and agreed to the State asking potential jurors whether they held a small baby. To preserve an alleged error during *voir dire* a party must make a timely objection and raise the issue in a posttrial motion. *People v. Fowler*, 222 Ill. App. 3d 157, 165 (1991). See also *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Because defense counsel made no objection to these questions and acquiesced to one of the questions, defendant has forfeited this issue for review.

¶ 33     Further, the trial court limited the prosecutor to broad questions, and less fact-specific to the case. For example, the prosecutor asked one juror "Have you ever heard of shaken baby Syndrome?" The prosecutor then followed up the question by asking, "Do you ever believe it's appropriate to shake a baby?" After questioning of the potential juror was completed, the trial court prohibited the prosecutor from asking the follow up question and thus, limited the prosecutor from potentially indoctrinating the potential jurors. Therefore, even if defendant had not forfeited this issue, defendant cannot establish that he was prejudiced from the prosecutor's question regarding shaken baby syndrome. See *People v. Rinehart*, 2012 IL 111719 ¶ 17 (stating that broad questions are generally permissible).

¶ 34                                B. Prior Injuries Evidence

¶ 35     Defendant argues that the trial court erred by admitting evidence of K.T.'s prior injuries, namely, evidence of healing rib fractures, bruises on K.T's buttocks, and scars on the bottom of her foot.

¶ 36     Defendant has forfeited review of this issue by failing to both timely object and include these issues in his motion for a new trial.  See *People v. Denson*, 2014 IL 116231, ¶ 11.  Failure to do either results in forfeiture.  There is, however, a well-established exception to that principle. Illinois Supreme Court Rule 615(a) provides that insubstantial errors "shall be disregarded" but that substantial or what have become known as plain errors "may be noticed although they were not brought to the attention of the trial court."  Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967).  As the language of the rule indicates, a reviewing court may exercise discretion and excuse a defendant's procedural default.  *People v. Clark*, 2016 IL 118845, ¶ 42.  There are two instances when it is appropriate to do so: (1) when "a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error," or (2) when "a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence."  *People v. Sebby*, 2017 IL 119445, ¶ 48.

¶ 37     Here, defendant asks us to review this issue under the first prong of the plain error doctrine, arguing that the evidence was so closely balanced that the errors severely threatened to tip the scales of justice against him.  However, in applying the plain error doctrine, it is appropriate to first determine whether a clear or obvious error occurred.  *People v. Smith*, 2016 IL 119659, ¶ 39.

¶ 38    Evidence is generally admissible if relevant.  See Ill. R. Evid. 402 (eff. Jan. 1, 2011).
Relevant evidence refers to evidence that has any tendency to make the existence of a fact of
consequence more or less probable than it would be without the evidence.  Ill. R. Evid. 401 (eff.
Jan. 1, 2011).  "Evidence of other crimes is admissible if it is relevant for any purpose other than
to show the defendant's propensity to commit crime."  *People v. Pikes*, 2013 IL 115171, ¶ 11
*People v. Chap.m.an*, 2012 IL 111896, ¶ 19 (2013) (citing *People v. Wilson*, 214 Ill. 2d 127, 135
(2005)).  Those purposes include motive, intent, identity, lack of mistake, and *modus operandi*.
*People v. Dabbs*, 239 Ill. 2d 277, 283 (2010).  Where evidence of other crimes "is offered for a
permissible purpose and not solely for propensity, such evidence will not be admitted if its
prejudicial impact substantially outweighs its probative value."  *Chap.m.an*, 2012 IL 111896, ¶ 19
(citing *People v. Moss*, 205 Ill. 2d 139 (2001)).  "When the State seeks admission of other-crimes
evidence, it must first show that a crime took place and that the defendant committed it or
participated in its commission."  *Pikes*, 2013 IL 115171, ¶ 15.  The State does not need to prove
the defendant's involvement beyond a reasonable doubt, "but such proof must be more than a mere
suspicion."  *People v. Thingvold*, 145 Ill.2d 441, 456 (1991).

¶ 39    A determination of the admissibility of evidence is in the sound discretion of the trial court
and will not be reversed on appeal absent an abuse of discretion.  *Pikes*, 2013 IL 115171, ¶ 12;
*People v. Illgen*, 145 Ill. 2d 353, 364 (1991).  Under the abuse of discretion standard, the appellate
court owes deference to the trial court's ability to evaluate the evidence's impact on the jury.
*People v. Donoho*, 204 Ill. 2d 159, 186 (2003).  The threshold for finding an abuse of discretion is
a high one and will not be overcome unless it can be said that the trial court's ruling was arbitrary,
fanciful, or unreasonable, or that no reasonable person would have taken the view adopted by the
trial court.  See *In re Leona W.*, 228 Ill. 2d 439, 460 (2008); *Donoho*, 204 Ill. 2d at 182.  Reasonable

minds can disagree about whether certain evidence is admissible without requiring a reversal of a trial court's evidentiary ruling under the abuse of discretion standard. *Donoho*, 204 Ill. 2d at 186.

¶ 40 Here, defendant was charged with first degree murder in violation of section 9-1(a)(1) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2016)). Section 9-1(a)(1) states that one who kills a person without lawful justification commits first degree murder if, in performing the acts that cause the death, he either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another. *Id.* During defendant's police interview he said that he accidentally fell on K.T. Further, defense counsel claimed that defendant's action that killed K.T. was accidental. Thus, defendant's intent was at issue in this case. Therefore, K.T.'s other injuries were probative of the issue of defendant's intent or lack of mistake. Thus, under the circumstances of the present case, we are unable to conclude that the trial court abused its discretion by admitting evidence of K.T.'s prior injuries. See *Illgen*, 145 Ill. 2d at 375.

¶ 41 We also note that the trial court also took care to minimize the prejudice to defendant by giving the jury a limiting instruction prior to the testimony of each other crimes witness. Specifically, the trial court instructed the jury that the evidence regarding K.T.'s prior injuries could only be considered for the limited purpose of showing defendant's intent and/or knowledge as to the current offense. The court also stated that it was for the jury to decide whether the defendant was involved in the conduct and, if so, what weight should be given to the evidence on the issue of intent, motive and knowledge. See *Illgen*, 145 Ill. 2d at 376 (indicating that the trial court's limiting instruction regarding the jury's consideration of the other-crimes evidence limited and substantially reduced any prejudicial effect created by the admission of the other-crimes evidence). The trial court accordingly did not abuse its discretion by admitting evidence of K.T.'s

prior injuries, and any prejudice resulting from such admission was reduced by the limiting instruction. Thus, no error occurred by the admission of this evidence, and defendant cannot establish plain error.

¶ 42 Defendant contends that there was only a mere suspicion that defendant caused K.T.'s prior injuries. Defendant cites *Thingvold*, 145 Ill. 2d 441, 452 (1991)), to support his argument. In *Thingvold* the defendant was charged with solicitation to commit murder of his wife. *Id*. at 445. The State presented evidence that his wife was stabbed several times at her office by an unidentified person approximately 11 months prior to her death. *Id*. at 456. The State acknowledged that defendant did not stab his wife and the witnesses whom defendant solicited to kill his wife testified "that they took no action towards that end." *Id*. The supreme court held that the trial court erred by admitting the evidence of the prior stabbing because the State failed to connect defendant to the stabbing. *Id*.

¶ 43 In contrast to *Thingvold*, the State in this case connected K.T.'s other injuries to defendant and established more than a mere suspicion that defendant caused the injuries at issue. The evidence showed that defendant was K.T.'s sole caregiver when K.T.'s mother was not present. There was no evidence indicating that K.T.'s mother abused K.T. or that K.T. had any other caregivers. Further, there was evidence that the only smoker in the house was defendant. Accordingly, this case is distinguishable from *Thingvold*, as there is more than a mere suspicion that defendant committed the acts at issue.

¶ 44 Next, defendant argues that defense counsel was ineffective for failing to object to the admission of K.T.'s prior injuries. A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Henderson*, 2013 IL 114040, ¶ 11. To prevail on such a claim, "a defendant must show

both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010). To establish deficient performance, the defendant must show his attorney's performance fell below an objective standard of reasonableness. *People v. Evans*, 209 Ill. 2d 194, 219-20 (2004) (citing *Strickland*, 466 U.S. at 687, 694). "'Effective assistance of counsel refers to competent, not perfect representation.'" *Evans*, 209 Ill. 2d at 220, (quoting *People v. Stewart*, 104 Ill. 2d 463, 491-92 (1984)). "It is axiomatic that a defense counsel will not be deemed ineffective for failing to make a futile objection." *People v. Holmes*, 397 Ill. App. 3d 737, 745 (2010).

¶ 45   To establish the second prong of *Strickland*, "[a] defendant establishes prejudice by showing that, but for counsel's unprofessional errors, there is a reasonable probability that the result of the proceeding would have been different." *People v. Houston*, 229 Ill. 2d 1, 4 (2008). A "reasonable probability" has been defined as a probability that would be sufficient to undermine confidence in the outcome of the trial. *Id*. "A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." *People v. Simpson*, 2015 IL 116512, ¶ 35.

¶ 46   Here, we have already determined that the evidence of K.T.'s other injuries was properly admitted. Accordingly, defense counsel could not have been ineffective for failing to object to the admission of this evidence. See *Holmes*, 397 Ill. App. 3d at 745.

¶ 47   Even if we were to assume a deficiency on the part of defense counsel, defendant has not shown the requisite prejudice. The prejudice prong of the *Strickland* test generally requires the defendant to show "a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Where a defendant challenges his conviction, the question is whether a reasonable probability exists that,

absent the alleged errors, the fact-finder would have entertained a reasonable doubt of guilt. *Id*. at 695. Here, the evidence against defendant was more than sufficient to establish his guilt beyond a reasonable doubt. The evidence showed that K.T. died as a result of a fatal shearing brain injury caused by shaking. Defendant admitted during his police interview that K.T. was crying and that he squeezed her by the ribs and shook her twice. Defendant admitted that he shook K.T. after he told the police several other stories about how K.T. was injured. Defendant was K.T.'s sole caregiver at the time she was fatally injured. Thus, the evidence was not closely balanced, rather it was overwhelming. Accordingly, defendant cannot establish the prejudice prong of the *Strickland* test and thus cannot establish ineffective assistance of counsel.

¶ 48                                   C. K.T.'s Sleeper

¶ 49    Defendant argues that he did not receive a fair trial because during closing argument the prosecutor commented about K.T.'s sleeper and showed the sleeper to the jury. Defendant acknowledges that no objection was made to the prosecutor's comment or action. However, defendant contends that we should view this as plain error under the first prong, because the evidence was closely balanced. However, we have already determined that the evidence was not closely balanced but overwhelmingly established defendant's guilt beyond a reasonable doubt. Therefore, defendant cannot establish plain error under the first prong.

¶ 50                                   III. CONCLUSION

¶ 51    For the reasons stated, we affirm defendant's conviction of first-degree murder.

¶ 52    Affirmed.